Grafton,
June 28, 1945. } No. 3530.

STATE *v.* ALLEN FREEMAN GEORGE.

*Harold K. Davison*, Acting Attorney-General, and *Norris H. Cotton*, Acting County Solicitor (*Mr. Davison* orally), for the State.

*John W. Stanley* and *Murchie & Murchie* (*Mr. Alexander Murchie* orally), for the defendant.

PAGE, J.   The defendant was charged with the murder of Mrs. Annie Roberts in the kitchen of the latter's house at Canaan at about five o'clock in the afternoon of December 29, 1943.   The defendant, thirty-three years old and unmarried, had returned in September, 1943, from some months in the military service.   Before entering the service, he had been "very much" interested in Mrs. Roberts, who was the mother of several sons old enough for military service.   The neighbors, with kindly understatement, called the relationship "very friendly."   From a letter written by Mrs. Roberts to the defendant while he was in the service, it could fairly be concluded that this "interest" or "friendship" was not merely Platonic.   There was also evidence that after September, 1943, Mrs. Roberts' interest in the defendant cooled.

Matters went especially ill, it could be found, from December 25 on.   Mrs. Roberts did not open the presents given her by the defendant that day, nor did she, as he admitted, before the afternoon of the supposed murder.   Another man had recently been about the house somewhat and might be thought then to be in better grace with Mrs. Roberts than the defendant was.   On Christmas night the defendant came to the Roberts house and found this man one of the party.   He opened a quarrel with him.   Daily thereafter, it

could be found, he quarreled with Mrs. Roberts about the unopened presents and other matters. On December 28, another man being in the Roberts house, the defendant made some plain early English talk to him, and also to Mrs. Roberts. According to the testimony, the quarrel with Mrs. Roberts became so heated that the defendant took her by the hair and the throat. He had then been drinking, as was the case on Christmas day. On December 29, sober but looking as if he had a "hangover," the defendant appeared at the Roberts house at about half past three, "more full of argument." He hunted for a ring he said he had lost the night before. Then he charged Mrs. Roberts with having a diamond ring of his. She denied it. At about four o'clock, the defendant requested another man present to leave, as he (the defendant) had something to talk over with Mrs. Roberts. The man complied. These facts were mostly denied by the defendant, but could be found on the evidence. A few minutes prior to the tragedy, a witness passing the Roberts house heard the defendant and Mrs. Roberts arguing excitedly.

One of Mrs. Roberts' sons, John, shortly after that found his mother dead, face down on the kitchen floor. By her side, at a distance of eighteen inches, was the defendant, wounded in the right chest, but alive. Mrs. Roberts had been shot by a bullet from a revolver owned by the defendant. This bullet had entered the left side of her neck. Its course was downward about twenty-five degrees to the horizontal, and backward fifteen degrees, to a point near her right shoulder blade. A bullet from the same revolver had entered the defendant from the front. The revolver was on the floor, under the defendant's right hip. There was a shell in each of the five chambers, two only of which had been discharged. Two extra shells were found in the defendant's right-hand topcoat pocket. Near the bodies, one of Mrs. Roberts' grandchildren sat in a carriage, somewhat splattered with blood.

Since the defendant did not rely solely upon his exception to the denial of a directed verdict at the close of the State's evidence, but proceeded to introduce evidence in his own behalf, we need consider the motions for directed verdicts only upon a view of all of the evidence in the case. *State* v. *Barry, ante,* 10, 12.

Two questions arise: (1) Did it appear beyond a reasonable doubt that the defendant shot Mrs. Roberts and then attempted suicide, instead of her shooting him and then committing suicide? (2) Did it appear beyond a reasonable doubt that the defendant premeditated murder?

The defendant claimed that he was shot, Mrs. Roberts holding the revolver by the stock, during a scuffle while she was trying to get it away from the defendant, who had just picked it up. In order to make the story plausible, the defendant said that he held the revolver by the barrel when Mrs. Roberts tried to take it from him, that it was discharged during the scuffle, and he was wounded. His story falls somewhat short of an adequate explanation of such an unusual and awkward hold. He says that he had loaned his revolver to Mrs. Roberts about a month before, after somebody had tapped on her window and frightened her; that she had kept it stuck between the head of the sofa and the wall; that he took it from there and proposed to take it home so that Mrs. Roberts' grandchildren, who played about the sofa, would not be hurt; that Mrs. Roberts objected to this proposal, and tried to get the revolver away from him.

The story that Mrs. Roberts put the revolver in a place of danger and thus seized upon the revolver cannot readily be reconciled with her fear of revolvers as credibly shown by the State's witnesses. She had not permitted her own sons to have revolvers, and while they had hunting arms, which they cleaned in the kitchen, the guns, when not in use or being cleaned, were kept upstairs. The jury could plainly be confident that Mrs. Roberts' fear of firearms in general, and fear for her grandchildren in particular, was greater than her fear of a windowtapper who had troubled her only once, if ever, and that a month or more earlier.

Since the argument for reasonable doubt rests upon the defendant's own story, while the State's witnesses, if believed, established a case, it is apparent that disbelief in his story would leave him without a reasonable doubt in his favor up to the point we have carried his testimony. As to the means by which Mrs. Roberts was later shot, as he says, he fares no better. He says that after she unintentionally shot him, in the course of a not unfriendly scuffle, she committed suicide. He was so stunned by his own wound that he fell back some five feet against the stove. Things went black, and he did not see her shoot herself, but a second shot roused him, and then he saw her leaning over the baby carriage. Since all the expert testimony showed that it was nearly impossible for Mrs. Roberts to have inflicted the wound she suffered while holding the revolver in her right hand, the defendant saw the weapon hang by the trigger guard from her left thumb.

Mrs. Roberts was right-handed. In order for the bullet to have

taken the course that it did from her neck to her right shoulder blade, some hand had to hold it higher than her left shoulder and somewhat to the front of it. If held in her right hand, this would be impossible unless the point of the muzzle was within six inches of her neck. The burns and powder marks on her neck and clothing indicated to the State's experts that the point of the muzzle was not less than six, nor more than twelve inches from the neck at the moment of discharge. One of the experts, Captain Van Amburgh, said it was not less than ten inches. In order to raise a "reasonable doubt" concerning the conclusion that Mrs. Roberts did not shoot herself, the defendant's expert demonstrated experimentally that he could hold the point of the muzzle in the right direction, with his own neck as the target, with his left hand, and presumably with his right. Apart from the inconclusiveness of his own experiment in its bearing on the ability of Mrs. Roberts to do the same, it is important to note that the holding was closer to the neck than the expert testimony indicated that the weapon could actually have been held. It is also interesting to note that the defendant's expert contented himself with saying that the methods used by the State's witnesses admitted of errors, and, significantly, that he did not himself give any opinion, based upon wound and powder marks and burns, as to the distance the weapon was held from the point where the bullet entered. This is the more astonishing, since he agreed exactly with the State's experts in their opinion, based upon the same methods he questioned, that the revolver was two to four inches from the defendant's topcoat when the bullet was discharged into his body. Under the circumstances, the jurors were amply warranted in finding that the weapon was held at a greater distance than that which the defendant's expert said would enable Mrs. Roberts to inflict her own wound with the left hand, if not with her right.

The jury could then believe, even beyond a reasonable doubt, that Mrs. Roberts could not have committed suicide with her right hand. But they could go further. While the State's experts denied the possibility of right-handed suicide, they had to admit the possibility of left-handed suicide. However, they said that it was "very unlikely" or "highly improbable." Captain Van Amburgh testified that in his opinion it was "almost a positive fact that she did not fire the shot herself." Even the defendant's expert said it would be an awkward and unusual way to commit suicide. No evidence produced in behalf of the defendant altered the obvious

conclusion that Mrs. Roberts, had she desired to commit suicide, would have held the revolver so as to pull the trigger with her right thumb, perhaps aided with the left thumb, and would have aimed at her heart or her head, with the revolver in front of her, and not from an awkward, all but impossible, position far to her left and well above her shoulder. Not only was the evidence preponderantly against such a remote chance; it was such as to leave next to no chance that Mrs. Roberts committed suicide and as to point overwhelmingly to the defendant as having shot her and then attempted suicide.

Moreover, the defendant's story is marked by a further inconsistency with undeniable physical facts. Seeing Mrs. Roberts leaning over the baby, the defendant says that he went to her and tried to straighten her up, after taking the weapon from her left hand. Thereupon, they both fell flat upon their faces on the floor, after which he knew nothing. The defense claims that the defendant's body was later kicked about by John Roberts, but there is neither claim nor evidence that Mrs. Roberts' body, with the pool of blood under her mouth, was disturbed before several photographs were taken of it. While the defendant's body had been moved before the photographer arrived, his hat on the floor, as well as the revolver, plainly indicate where his body had lain and which way his feet extended. If the two had fallen flat while he was attempting to straighten Mrs. Roberts when her feet were close to the baby carriage, even though they had turned slightly in the process, both bodies would have been found with their feet near the carriage. Instead, both heads were toward the carriage, while their bodies and feet extended away from it. The jury were warranted in rejecting the defendant's story entirely, leaving it of no slightest value in establishing a reasonable doubt.

To warrant conviction of murder in the first degree, "the state must show beyond a reasonable doubt not only killing with malice, but must go further and show that the killing was deliberate and premeditated," unless done by poison, starving, torture, or in the course of actual or attempted arson, kidnaping, rape, robbery, or burglary. *State* v. *Greenleaf*, 71 N. H. 606, 613; R. L., c. 455, s. 1. None of the special circumstances mentioned in the statute rendered the act charged against the defendant murder in the first degree. Consequently the evidence will not warrant conviction unless it places beyond reasonable doubt the belief that the defendant killed Mrs. Roberts after deliberation and premeditation to that end.

For the defendant, it is argued that Mrs. Roberts was "the unfortunate victim of the not unfriendly scuffle over possession of the revolver from which the two shots were fired." Everything therefore turns upon the weight that the jury were bound to give to the defendant's story that Mrs. Roberts was the victim of a scuffle, directly or indirectly.

To persuade the jury that there was a scuffle, the defendant had to induce them to adopt his claim that he did not bring the revolver in that afternoon. He asserted that he found the revolver there, exactly where he had seen Mrs. Roberts put it about a month before, when, as he asserted, he had loaned it to her for possible protection against somebody who had tapped on her window.

The jury had plenty of evidence to justify complete rejection of the theory of the prior loan. First, there was the testimony of several witnesses that Mrs. Roberts was afraid of firearms, especially revolvers. Second, the place where, according to the story, Mrs. Roberts had placed the revolver weeks before, and whence the defendant took it that afternoon, was between the sofa and the wall; while the bullets which he put in his pocket he took from an open box on the stand near the sofa. To account for nobody having meanwhile seen either weapon or cartridges, the defendant said that the sofa was littered with pillows, newspapers, blankets, and sweaters; while the box was covered with a magazine or something. But the State's rebuttal evidence could be thought wholly to demolish belief in the claims just outlined. According to the rebuttal, both the stand and the sofa had been overturned between Thanksgiving and Christmas by some of Mrs. Roberts' grandchildren in play. The box in which the cartridges were supposed to be went on the floor and the contents were spilled, yet the witness who picked things up and put them to rights, saw neither revolver nor cartridges.

The facts alleged by the defendant were the necessary basis for his present position that there is reasonable doubt as to premeditation. These facts are subsidiary facts, and the jury could reject them upon what they believed to be the balance of probabilities. *State* v. *Barry, ante*, 10, 13. The evidence as a whole justified the jury in rejecting the defendant's claim that the revolver was in the house before he entered that afternoon and that it later came into his possession innocently because he wished to take it home so the children would not be hurt by it, while Mrs. Roberts resisted, though she was afraid of revolvers and would not let her grown sons have

them in her house, and insisted that the revolver be left where it was obviously dangerous to the grandchildren she loved. Rejecting the very theory on which the defendant built his defense, there was no ground for the jury to believe that the revolver was ever tucked between the sofa and the wall, that there was any occasion for a scuffle over it, or, indeed, any scuffle at all. With that departed the basis for a reasonable doubt.

Rejecting the defendant's story, the jury would conclude properly and beyond reasonable doubt that the defendant, as indicated by the wounds, fired the shot that killed Mrs. Roberts, then turned the weapon on himself. Beyond that it was patently reasonable to conclude, since the weapon was not where the defendant represented it to be, that he brought it in that afternoon. In connection with the series of quarrels between him and Mrs. Roberts beginning several days before, the jury could conclude that, being jealous and angry, he brought the gun with the purpose of using it as he did. That would clearly be premeditation, and it could be found beyond a reasonable doubt; that is, as Chief Justice *Shaw* expressed it, with "reasonable and moral certainty" (*Commonwealth* v. *Webster*, 5 Cush. 295, 320), or as the Presiding Justice expressed it in this case, that it was "a plain case of guilt" stripped of "imaginary doubts," without reference to "some possible way to let the respondent out" or to "considerations of sentiment."

The defendant excepted to the admission of three statements he made to a police officer who guarded him while he was in the hospital recovering from his wound. The Presiding Justice found that two of them were made voluntarily. In reaching his findings, he had to consider whether the statements were made under the influence of fear or hope of favor. That included, of course, every one of the inducements, if any, that led the defendant to speak. The decision made is not to be reversed except upon a showing of "clear and manifest error." *State* v. *Squires*, 48 N. H. 364, 368. Though the defendant was not under formal arrest, the officer had a sort of custody which should have aroused some sense of the duties he owed the defendant not to seek from him a statement that would not be admissible under the rule applicable when persons are under arrest. It may be observed, however, as a preliminary, that the officer was well known to the defendant, and it was not necessary to inform him that he was an officer. There was ample evidence, also, that the defendant had his wits about him on the nights when he made the voluntary statements, the second and third nights

after the tragedy. This left, it is true, the lack of warning to the defendant that what he said might be used against him. But, as will appear, the lack is not material.

The character and the setting of the statements is important. On the second night, the officer did not ask the defendant any question. Instead, the defendant asked the officer whether Mrs. Roberts was dead. The officer replied in the affirmative, whereupon the defendant without any prompting said, "It's too bad it couldn't have been the other way around." A more purely voluntary statement could not be conceived. The defendant complains that he was not warned. But the officer had no occasion to warn him; he answered a plain question correctly and without threat or attempt to elicit a statement; he had no reason to foresee that his own answer that Mrs. Roberts was dead would cause the defendant to make a statement damaging to himself. Since he was not seeking to draw the defendant out, there was no need for a warning.

The statement on the third night was made under circumstances at least as unprejudicial to the defendant. Not in answer to any attempt to extract a statement, but for some purpose of his own, the defendant again asked the question. "What will I get for this? life?" The officer replied that he did not know, and that was the end of the matter. Again, nothing could be more voluntary.

Nevertheless, the defendant argues that under some statutes, even after a warning, a confession is not admissible. The only statute invoked is R. L., c. 423. Section 4 provides for arraignment before a court or justice within twenty-four hours. It is not necessary for us to decide that a failure to arraign promptly makes inadmissible a statement meanwhile given. See *McNabb* v. *United States*, 318 U. S. 332; *Anderson* v. *United States*, 318 U. S. 350. Our statute cannot, perforce, require that a man in the defendant's situation should be removed from a hospital to the court house or a prison. Sections 7 and 8 of our statute provide that after detention in a police station, the officers in charge of the station shall have certain duties with respect to putting the prisoner into touch with relatives, friends, or an attorney. None of these provisions bear upon the question of the admissibility of these voluntary statements.

The rule of exclusion is based upon the untrustworthiness of a statement in which the accused is compelled to incriminate himself, one "uttered under the direct and palpable pressure of an inducement to substitute something else for the truth." Wig. Ev. (3d *ed.*),

*s.* 815. Such a statement is excluded because it is of doubtful credit. *Ib. s.* 822. When we speak of a voluntary confession, all we mean is that it is trustworthy because it was not induced by threat, promise, fear, or hope. *Ib. ss.* 825, 826. Upon these tests the finding below of the voluntary character of the first two statements was wholly proper, even if we assume that they were confessions, which is doubtful.

On the fourth night, the officer, without warning the defendant, asked him whether there was anybody else in the room at the time of the shooting than Mrs. Roberts and the defendant. The defendant replied that he did not think so. Perhaps that statement, if it had been a confession, would have been inadmissible. But it was not a confession; the acknowledgment of a subordinate fact, "*not directly involving guilt*, or, in other words, not essential to the crime charged, is not a confession; . . ." and all other admissions than those which directly touch the fact of guilt are without the scope of the peculiar rules affecting the use of confessions. Wig. Ev. (3d. *ed.*), *ss.* 821 (3), 1050 (1) (a). In any event, the statement satisfies every test of trustworthiness except that of warning. Nobody who reads the record of the trial can doubt that the statement represents the exact truth, except for the unsubstantial fact that a baby of a few months was present. Only the most technical ground can be found for the exclusion of the statement, and that does not really go to the fundamental of trustworthiness. Its admission was not reversible error, because it was not a confession of guilt in any manner of speaking, and because it was thoroughly trustworthy anyhow. Not even the defendant on the stand felt called upon to say that anybody else was present.

While the defendant's counsel was cross-examining Ross Williams, a State's witness, he made use of a document that he held in his hand, a statement taken from Williams by associate counsel for the defendant. After the completion of the cross-examination, the State's counsel demanded that the document be given to him for inspection. Over the vigorous protest of the defendant's counsel, the Court ordered the document to be delivered, and it was delivered. The defendant excepted.

It is now argued that the document belonged to the defendant, being merely in the possession of his counsel. If the defendant's, it would have been testimonial compulsion for the Court, by process or otherwise, to force the defendant to produce the paper for use at the trial. *Petition of Snow*, 75 N. H. 7. But the privilege against

compulsion is merely an option of refusal, not a prohibition of inquiry. The privilege must be claimed. Wig. Ev. (3d *ed.*), s. 2268. By the same token, the privilege may be waived. The defendant made loud his claim to privilege, but only after he had waived it by voluntarily producing the document in court and using it in the course of examining a witness. The privilege against the use of the paper in the examination of that witness ceased to be when the defendant so used it. Wig. Ev. (3d *ed.*), s. 2275. No more is here decided than that the use of the document in the manner the defendant used it is a waiver of its further use by the State in accordance with the ordinary rules applicable to documents produced by the contrary party in civil actions.

The defendant's counsel argues with much emphasis the inadmissibility of evidence that on the night immediately following the shooting, the prosecuting officer telephoned the hospital to ask the surgeon in charge whether it would be proper to interview the defendant and question him. The witness was permitted to testify what he heard the surgeon say to the girl in charge of the telephone at the hospital. While, for the purpose of establishing the physical and mental condition of the defendant, this may have been hearsay, it was admitted merely for the purpose of establishing the good faith of the prosecuting officer. If there had been any proof of a statement made by the defendant that night, it may be that the admission of the statement, backed only by hearsay testimony of the physical and mental condition of the defendant, would have raised an issue of testimonial compulsion. But the issue was avoided by the refusal of the Presiding Justice to admit any testimony whatever of what passed that night between the officers of the law and the defendant. Yet the defendant tries to make it appear that he was prejudiced by this evidence of what the doctor said the first night, since the jury would regard it as evidence of the condition of the defendant on the three succeeding nights. Aside from the fact that there was plenty of other evidence that the defendant's condition was good on the succeeding nights, which would tend to render the supposed prejudice harmless, it is conclusive to say that concerning purely voluntary statements and an acknowledgment not a confession, there could be no prejudice at all because of improper evidence of prior mental and physical condition. That special test of trustworthiness was in this case immaterial.

There were a number of other exceptions to evidence which the defendant's counsel has not briefed or argued. While the omission

to do so is not lightly to be taken as a waiver of the exceptions in a capital cause, it may be fair to suppose that counsel would have alluded to them if he had seen substantial reason to think that they warranted a new trial. We have examined each and every one of them with some degree of care and on our part find no prejudicial error. Some were leading questions properly asked for the purpose of refreshing recollection or recapitulation. Other questions or answers were captiously objected to because of no reason than that they concerned possibilities. We have already pointed out that, while probabilities are the test, probabilities may be made up of possibilities; the possibility is excluded when nothing else appears to remove the probability from speculation. *Leavitt* v. *Bacon*, 89 N. H. 383, 392. And it was proper to ascertain fully the movements of one of the witnesses as to place and time in order to establish the approximate time of the shooting, and likewise to trace the movements of those who testified to the movements of the witness. Certain exceptions to opinion evidence are untenable, either because it could be found that knowledge of facts was not remote, or because an opinion of comparison was made by a witness having knowledge of the facts behind the comparison, or because for some other reason the witness was found to be qualified. An illustrative demonstration of the direction in which the weapon must have been held in order to inflict the wound on Mrs. Roberts was perfectly proper, since it was based upon the observed course of the bullet.

The motion to quash because the indictment did not express a meaning in the precise words the defendant's counsel understood it to mean, not briefed or argued, is of course without merit. The motion demonstrated that counsel could and did understand the charge, and it may be assumed that the Court did also, which was all that was required. R. L., *c.* 427, *s.* 12.

There were numerous exceptions to argument by the Acting Attorney-General. One statement made was that George Durand said that the defendant "was grabbed and thrown over the washing machine by Jesse." On objection, this was withdrawn and the jury were instructed to disregard it. The only possible error in the argument was in ascribing to Durand the story about Jesse throwing the defendant over the washing machine when he prepared to fight Durand. It was Cyrus Roberts who testified to the fact. If it was reversible error to miscall the name of the witness, the withdrawal of the statement of fact actually made by Cyrus certainly cured the error.

The argument that the defendant's expert did not contradict Van Amburgh had sound basis, as has already appeared.

The argument was made that the ballistics experts on both sides agreed that it was a common thing for suicides to shoot themselves by pulling the trigger with one or both thumbs, and that it was an easy way to do it. That is concededly a fair statement of the evidence. "But," it is urged, "counsel then said that considering the point of injury by the bullets the experts agreed it was a difficult, unusual way to commit suicide." Objection to the argument was based on the statement, supposed to have been made, that the defendant's expert agreed to that. Yet in his brief, defendant's counsel admits that his expert testified, with reference to the course of the bullet that killed Mrs. Roberts and on the assumption that the weapon was held not over six inches away, that it "would be an awkward manner to do it, rather unusual, and not the easiest way." The argument was proper. It did not fairly suggest, as the defendant urges, that there was expert agreement that pulling the trigger by the thumb was always an unusual way to commit suicide, but that it was unusual if done with the gun held six inches from the left side of the neck and in a direction to inflict the wound suffered by Mrs. Roberts. There was no confusion of two divergent lines of evidence, as the defendant asserts, but a harmonization of testimony in its application to undisputed physical facts.

"No evidence was introduced by the respondent's expert," argued the Acting Attorney-General, "to contradict Captain Van Amburgh on his judgment that the gun was held ten to twelve inches from Annie Roberts' throat from the point of injury." We have already noted that the defendant's expert went no further than to assert that the method used in behalf of the State might be subject to some error, though strangely enough his opinion as to the distance of the weapon when it wounded the defendant coincided exactly with Van Amburgh's opinion. And the defendant's expert was not even asked for an opinion as to the distance of the gun when Mrs. Roberts was killed. Strictly correct and sustainable as the argument was, the Court ordered it withdrawn, it was in fact withdrawn, and the jury were told to disregard it. The exception taken is unavailing from any standpoint.

The defendant excepted to an argument that he choked Mrs. Roberts in her bedroom on the evening of December 28, because it is asserted that the witness who described the scene merely said that George put his hands on her throat. But that testimony alone

would warrant the argument, and there was the added testimony of the same witness concerning Mrs. Roberts' fright and her attempt to escape from the defendant.

After this assault, the Acting Attorney-General argued, Mrs. Roberts "got up in her pajamas and bare feet and ran out into the winter night." Upon objection, the Court repudiated this argument. It was withdrawn, and for it was substituted the argument that "she ran out into the shed . . . in her bare feet, or some place outside." To this an exception was taken. The testimony was that Mrs. Roberts did run in pajamas and bare feet from her bed into the shed, that she later evaded the defendant by hiding in the pantry, and still later slipped by him in the dark kitchen and returned to the bedroom. The argument that she ran into the shed or somewhere outside was sufficiently accurate. What was important was that she ran away from the defendant after he laid hands on her, as definitely shown by the testimony which the jury could believe.

There was an exception to an argument that on the night of this incident, the defendant, who claimed that he tried to keep Mrs. Roberts' daughter-in-law from drinking, "was her adviser . . . to the extent that . . . he went over to Goddard's and took Dorothy over there and brought a case of beer." The only objection to this is that his taking of the beer and of Dorothy to the Goddard's was not simultaneous, but separated by a few hours. That does not seem to matter much, for the nub of the argument is that the defendant "guardian" brought Dorothy and the beer together. In any event, the defendant said in one portion of his testimony, when he apparently wished it to appear that Dorothy was with him at Goddard's earlier, rather than later, that she was there with him the "first part of the evening," at the time he brought the case of beer.

There was an exception to an argument that the couch was tipped over. Such was the evidence, given in rebuttal, but the Acting Attorney-General took the precaution of withdrawing it.

The defendant has not pursued his exception to the statement made in argument that Mrs. Roberts and the defendant, after the shooting, fell in a heap. As it was followed by reading the actual testimony given by the defendant, it can have prejudiced the defendant in no wise.

Nor have the exceptions to the instructions been pursued. One of them cautioned the jury to disregard any misstatements in

argument and to take their own recollections. As we have seen, this was a needless precaution, since no possibly prejudicial misstatement was made without being withdrawn wholly and completely.

The exception to the denial of the motion to set the verdict aside raises no question not already discussed. The motion to stay execution of sentence, not pursued in this Court, raises no question for us. Even if not within the discretion of the Presiding Justice, as to which no determination is made, the denial of the motion has not prejudiced the defendant or his right to freedom in any manner or degree.

*Exceptions overruled.*

MARBLE, C. J., was absent: the others concurred.