Hillsborough,
No. 4922.

STATE *v.* RUSSELL NELSON *& a.*

Argued September 7, 1961.

Decided November 30, 1961.

*Gardner C. Turner,* Attorney General; *Elmer T. Bourque,* Assistant Attorney General; *Conrad Danais,* county attorney (*Mr. Turner* and *Mr. Bourque* orally), for the State.

*Leonard & Leonard* and *Leo Patrick McGowan* (of Rhode Island) (*Mr. Richard Leonard* and *Mr. McGowan* orally), for defendant Nelson.

*Julius H. Soble* (of Massachusetts) (by brief and orally), for defendant Martineau.

WHEELER, J. · There was evidence from which the jury could find the following facts: On February 9, 1959, just before noon, the body of Maurice Gagnon was found in the front seat of his white Cadillac automobile in a parking lot in Nashua. The body was lying on the front seat on its left side with the head under the steering wheel. A bullet later found in the brain had been discharged from a gun held not more than five inches from the left ear. Death could have occurred shortly thereafter and between the hours of 6:30 in the evening of Sunday, February 8, 1959, and 2:30 A. M. Monday, February 9, 1959. Gagnon, who lived in Lincoln, Rhode Island in a trailer, was part owner of Skateland, a roller skating rink in Georgiaville, Rhode Island, and also operated Magco Plastics in Lawnsdale, Rhode Island, employing approximately fifty persons.

The defendants Martineau and Nelson lived respectively in Pawtucket and Providence, Rhode Island. They, with one Knowles, were under indictment in Rhode Island for burglarizing Gagnon's trailer, with the trial scheduled to start February 10, 1959, the maximum penalty being life imprisonment. On the previous Wednesday, Martineau had sought out Gagnon and tried to induce him to change his testimony, but he refused. On Sunday, February 8, 1959, between 5:20 and 5:30 P. M., Gagnon's partner, Jack Rose, left him at the roller skating rink in Georgiaville where he was in the process of repairing skates in the skate room. When the police visited the room on the following evening, a single skate was found in the middle of the floor with its mate in the skate rack. Skateland is located on Whipple Road. About 7:00 o'clock on the evening of February 8, 1959 an attendant at a filling station located at the intersection of Douglas Pike, and Whipple Road heard a car come out of Whipple Road at a "terrific rate of speed" estimated to be ninety to one hundred miles an hour. The attendant knew Gagnon and had previously seen his car at the filling station. He testified it was Gagnon's car because it came out of Whipple Road and he had never seen a similar car in the vicinity.

On Sunday afternoon, February 8, between 3:30 and 4:00 P. M., a Mr. and Mrs. Albert Fossa who were acquainted with Mr. and Mrs. Martineau went to the Old Canteen restaurant on Atlas Avenue in Providence where they met Martineau and Nelson and

invited them to have dinner. Nelson and Martineau left the restaurant together around 5:00 P. M. At 10:00 o'clock that evening Nelson's car was observed parked on Alexander Street in Lincoln, Rhode Island, about one and a quarter miles from Gagnon's trailer home. The same car was there the next morning. On Saturday evening, February 7, one Robert Almonte, who at the time of the trial was under indictment as an accessory after the fact to the murder of Maurice Gagnon, shared a room at the Plaza Hotel, Providence, Rhode Island, with defendant Nelson. The following evening (Sunday) at about 8:00 o'clock Almonte went to the Bradford Social Club on Atwood Avenue in Providence. Two calls were placed from an outdoor telephone booth in front of the Nashua city hall at 10:18 P. M. that evening. The first call was made to the Albert Fossa home where there was no answer. The second call was to the Bradford Social Club and was completed.

Almonte left the Bradford Social Club between 10:00 and 11:00 P. M. and walked to the Fountain Lounge, arriving there between 10:30 and 11:00 o'clock. The owner of the Lounge, one Thomas Tomasian, loaned Almonte the keys to his car. Not long after midnight Almonte arrived at the Bedford, Massachusetts police station and inquired for directions to Nashua, New Hampshire. He appeared nervous.

Police officers in Nashua, at 12:51 A. M. Monday, February 9, observed a 1959 light-colored Chevrolet automobile bearing registration plates "RI TT 130" with one occupant proceeding north on Main Street. These registration plates had been issued to Thomas Tomasian. As the car passed through the intersection of Hollis Street, it slowed down and veered to the right. The operator looked toward the Yankee Flyer restaurant and then pulled into the center lane and continued in a northerly direction. Another police officer stationed further north also observed the same car approaching from the south. The operator pulled over toward the officer and inquired the directions to the Yankee Flyer, then reversed his course and headed south on Main Street in the direction of that restaurant. The operator was later identified as Robert Almonte.

The police officers who first observed this motor vehicle proceeded north on the westerly side of Main Street to the Central Variety Store from which point they observed a man on the opposite side of the street walking south and saw him turn into a driveway next to the Yankee Flyer. The motor vehicle with registration plates "RI TT 130" reappeared on Main Street heading south and

turned into the same driveway, returning to Main Street shortly thereafter with two occupants. The officers stepped into the street and stopped the vehicle. The occupants were identified as Almonte and Nelson. Almonte could not produce a driver's license and they were taken to the police station and detained for questioning.

Later that same morning at 3:50 A. M. Martineau was seen in a parking lot located at the intersection of Spring and East Pearl Streets. An officer in a patrol car proceeding north on Spring Street approaching the parking lot observed him walking toward Spring Street. As he approached, the officer opened the door of his vehicle and snapped on the dome light. Martineau, who was about six feet from the police car, looked at the officer and then proceeded to run south on Spring Street to the junior high school. The officer gave chase and Martineau disappeared around the southeast corner of the school building where he was apprehended some 1,500 feet from the point where Gagnon's body was later found. Thereafter that morning traveler's checks in Gagnon's name were discovered throughout the neighborhood of the parking lot where the body was found. Also $850 in cash was found in the window well on the south side of the school building near where Martineau disappeared. It consisted of three one-hundred-dollar bills and eleven fifty-dollar bills, one of which was bloodstained. It was established that on the previous Friday evening Gagnon had received two one-hundred-dollar bills and four fifty-dollar bills from his partner Rose and was to provide an additional four hundred dollars for deposit to their corporation account the following Monday morning.

Certain chemical and microscopic tests were made of the defendants' clothing and areas of their hands and bodies for the presence of blood and other foreign matter. Martineau's hands and wrists were examined at about 7:30 Monday evening, February 9 and blood was discovered on them, but it was not possible to determine whether it was human. A bloodstain of considerable size was found in the lining of the lefthand pocket of Martineau's topcoat. This stain was identified as Type "O" blood, which was the same type as Martineau's and the victim Gagnon's. At the trial Martineau attempted to explain the presence of blood on his clothing by claiming he had been beaten up by a Rhode Island state police officer in the Nashua police station. It appeared that his clothing had been removed on Monday at 4:00 P. M. and the Rhode Island police did not arrive until 7:00 P. M. He further

testified that on the night of February 4 or 5 his wife hit her nose on the cupboard and she had a hemorrhage which splattered on the rug. On rebuttal it was established by the State that Mrs. Martineau's blood was Type "A". Bloodstains of an undetermined type were found in the lining of Martineau's left trousers pocket, on the right hip pocket and in the fly. An area of blood was found on the left side and in the left pocket of his suede jacket. Two stains were found on his left shoe and one on the right. Inside of Martineau's lefthand topcoat pocket a dark colored gray-blackish smudge was found which upon analysis was determined to contain firearm discharge residue. Martineau is left-handed.

On Nelson's jacket an area of blood was discovered near the right side pocket and on the stitching of his right shoe. Some twenty-two strands of hair were found in the Gagnon motor vehicle, seventeen of which were identified as having come from the victim Gagnon and four from the defendant Martineau. Certain foreign substances were vacuumed from the floor of the victim's automobile and compared with fibers on the shoes of the defendants. The State's expert testified that both Nelson's and Martineau's shoes had been in physical contact with the floor mats of the Gagnon vehicle and that certain plastic particles found on the clothing of the defendants probably originated from the interior of Gagnon's automobile, some of which were similar to those used in his plastics plant.

Both defendants took the stand and the substance of their defense was that they had arrived in Nashua without prearrangement and for unrelated reasons and that their presence there when Gagnon's body was discovered was wholly coincidental. It was their further contention that his death occurred after they had been taken into custody by the police.

The defendants contend before us that the Trial Court erred in denying their motion to dismiss the kidnaping indictment (728) or, in the alternative, should have postponed the date of trial of this indictment.

This argument is based principally upon the premise that the indictment was returned by the Grand Jury on September 29, 1959, the day before the trial commenced on the first two indictments and served to inflame a previous prejudicial situation allegedly created by the widespread publicity given the case by a local newspaper and other news media.

The balancing of the constitutional rights of any defendant to a

fair trial with the equally important constitutional right of the press to be unfettered in reporting the news presents, at times, a problem of grave concern for the Trial Court. The very nature of the charges against these defendants could not fail to create general public interest with attendant widespread publicity through the various news channels. "The newspaper coverage was undoubtedly extensive . . . It does not follow, however, that the inevitable result is that the defendants must be released because they can never be constitutionally tried (see *Delaney* v. *United States*, 199 F. 2d 107, 112 (1st Cir. 1952) or that these particular indictments should be quashed. Nor must we conclude that these convictions be set aside because of the trial date." *Commonwealth* v. *Geagan*, 339 Mass. 487, 500, 501 (Brink's robbery case). As was stated in *Delaney, supra,* at *p.* 113, "The courts are then limited to doing what they can to insulate jurors from the prejudicial effects of such publicity, as by cautionary instructions or by the granting of continuances, or in some cases granting a change of venue." See Note, Controlling Press and Radio Influence on Trials, 63 Harv. L. Rev. 840.

The defendants cite as the most convincing evidence of the prejudice created by the widespread publicity the fact that it took from September 30, 1959 to October 19, 1959 to select a jury. On the contrary, it indicates the extreme care taken by the Trial Court to insure that an impartial jury was selected. It is conceded that when the jury was finally impaneled the defendants had not exhausted their peremptory challenges. Since the Trial Judge is in the best position to weigh what would be fairest to both parties, he has wide discretion as to whether to grant a continuance. In ordering the defendants to proceed to trial on all indictments simultaneously we find no abuse of discretion.

It is further contended that the Court erred in denying defendants' motion to compel the State to elect upon which of the three indictments it intended to rely for conviction.

Both defendants were charged in three indictments with but one offense, to wit, the murder of Maurice Gagnon. It is urged that because Martineau and Nelson were alternately charged in two indictments with being a principal in the first degree and in the second degree to the same offense placed upon them an "onerous" burden in preparation of their defense which in effect transposed the State's burden of proving guilt to the defendants, forcing them to prove themselves innocent of inconsistent crimes, thus creating a

game of judicial "hide and seek." It is conceded by defendants' counsel that each indictment standing alone sets forth in "rather detailed language what the respondent is charged with having done," but it is argued when tried together the defendants were required to speculate upon which of the three inconsistent indictments the State proposed to rely.

By proceeding to trial on all three indictments, the State gave defendants notice of all the charges upon which it proposed to introduce evidence. The State is not required to elect in advance of trial which method was employed to accomplish the commission of an offense (*State* v. *Lacoshus*, 96 N. H. 76, 78), but if it is established that different offenses charged do not relate to the same transaction, the Court may at any stage of the trial put the prosecution to its election or quash the indictments. *State* v. *Lincoln*, 49 N. H. 464. In denying the defendants' motion to compel the State to elect we find no error.

The defendants objected and excepted to the ruling of the Court permitting Dr. John Spring, medical referee of Hillsborough County, to express an opinion as to the cause and time of death of the victim on the grounds that he did not "perform nor participate in the performance of the autopsy, and was not a pathologist."

In this state the test to determine the qualifications of an expert witness "is to inquire whether the witness' knowledge of the matter in relation to which his opinion is asked is such, or so great, that it will probably aid the trier in the search for the truth." *State* v. *Killeen*, 79 N. H. 201, 202, and cases cited.

Dr. Spring had been medical referee since 1956 and a deputy medical referee for twenty-two years prior to that time. In the performance of his official duties he had viewed many bodies and determined the cause of death. At the police garage he examined Gagnon's body for rigor mortis. He was present at the autopsy and to some extent participated therein. He probed the bullet hole in Gagnon's skull and observed the damage to the brain tissue. He testified that death occurred twelve to twenty hours before the autopsy was performed. This was evidence from which the Court could find that his testimony would probably aid the jury, and the defendants' exceptions are therefore overruled.

It is next contended that Indictment 728 charging the defendants jointly with kidnaping and murder does not properly charge such a crime and is therefore "defective and void."

The defendants' argument is directed not to the form of the

indictment but to the sufficiency of the evidence to support a conviction and in particular to the lack of evidence to establish abduction with intent to confine or hold the victim against his will. RSA 585:19. It could be found that the victim was forcibly abducted from Rhode Island and rendered unconscious by a blow on the head before he was shot. When his Cadillac was found in the parking lot on February 9, its rear end was elevated with the front bumper almost touching the ground. The vehicle was equipped with an "Air Ride" system controlled by a regulator located in the front of the car in the same position as the emergency brake on most vehicles. When this regulator is pulled out to its fullest extent the rear of the car is raised as much as nine inches. Gagnon's car was raised to its maximum. This warranted the inference that the car had been in the control of someone other than Gagnon.

It is elemental that intent may be established by circumstantial evidence. *State* v. *Iacavone,* 85 N. H. 207, 209; 3 Wharton's Criminal Evidence, *s.* 980. Without further elaboration, the evidence taken as a whole was sufficient to support the verdict of the jury.

The defendants' motions for directed verdicts were properly denied. It is settled law that the burden is on the State to establish the defendants' guilt beyond a reasonable doubt, but this burden does not apply to every evidentiary fact in the case. *State* v. *Barry,* 93 N. H. 10, 13; *State* v. *George,* 93 N. H. 408. It is true, as contended by the defendants, that the "first and fundamental issue" is whether or not the offenses charged were committed within this state. Dr. Richard Ford, Massachusetts State Police pathologist and head of the Department of Legal Medicine at Harvard University, testified that the victim died in his automobile "at or near" the place where the body was discovered and died very quickly after the gunshot in his head. The basis for this opinion as to the place of shooting was the position of Gagnon's body in the front seat of the automobile and certain blood patterns and splatters on the victim's body and on the upholstery indicating that he had been sitting upright on the far right side of the front seat next to the righthand door with his hands in his lap and his head forward, bleeding down the front onto his hands with blood splattered around in a semicircular pattern. It was the witness' opinion that when shot the victim was unconscious from certain blows on the head and sitting in an upright position. He further testified if the body had been driven any distance after the shooting, "the blood would be all over the place."

Both defendants were apprehended in Nashua in the early morning of February 9. After they were apprehended, each gave certain conflicting statements as to their relationship and as to the reason for their presence in Nashua. Martineau stated that he had been sleeping for perhaps two hours in a parking lot prior to his arrest. His own expert witness testified that because of the below-zero temperature that night, a person falling asleep out of doors, clothed as Martineau was, would not have survived long. The defense expert further testified that death occurred six or eight hours prior to the autopsy at 3:30 P. M. on February 9 but that if the car was in the parking lot at 3:00 o'clock on the morning of February 9, which was the State's evidence, there probably was a body in it and he would have to change his opinion as to the time of death. There was evidence that the Gagnon car was seen in the parking lot at 11:00 P. M. February 8, and also at 3:00 A. M. February 9.

While Nelson was awaiting trial at the Hillsborough County jail, he became acquainted with one Crooker, another inmate, and they spent much time together playing chess. Crooker testified that Nelson told him, among other things, that Gagnon had been kidnaped in Rhode Island and taken to Hudson and that in Hudson Martineau shot Gagnon on Nelson's instructions. While Crooker's testimony was at times confused and contradictory, he did furnish certain information which, if believed, supported the State's contention. The fact that Crooker had a criminal record and may have hoped for clemency by testifying for the State does not render his testimony incompetent. It was within the province of the jury to decide whether to give it weight.

The defendants' physical presence in the car was established by certain fibers and other foreign matter found on their clothing and the floor mats of the Gagnon vehicle. Without further reviewing the evidence in detail, considered as a whole the jury could find beyond a reasonable doubt that the offenses with which the defendants were charged occurred in this state and that the defendants were the perpetrators.

In the course of the trial the defendants called as witness a man who lived near the parking lot where the body was found, who testified that shortly after it was found he told the chief of police at the scene that he had seen the car there the preceding night at about 11 o'clock. When asked what the chief had said to him, the witness replied: "Well, he says that the police officer felt it

and the car was warm." Subject to the defendants' exception the answer was stricken. At the time, counsel contended that the statement made by the chief was admissible as part of the *"res gestae,"* and now argue that it was admissible under the "contemporaneous utterance" exception to the hearsay rule making admissible statements made "while the declarant was perceiving the event or condition which the statement . . . describes." See A. L. I. Model Code of Evidence, Rule 512 (a).

As the Trial Court pointed out, the offer of proof subsequently made by the defendants did not offer evidence that the chief made a statement based upon his own contemporaneous perception. The answer of the witness which was stricken from the evidence contained hearsay upon hearsay, since the alleged statement by the chief related to a statement made to him by a police officer. The evidence failed to satisfy the requirements of the evidentiary rule and was properly excluded. *Semprini* v. *Railroad,* 87 N. H. 279. The defendants' exceptions are therefore overruled.

We next consider whether the Court erred in refusing to instruct the jury in accordance with defendants' requests 7, 8, 9, 17, 19, 20, 22, 28 and 29.

Requests 7, 8 and 9 relate to the sufficiency of the evidence to sustain a verdict of guilty and are disposed of by what has previously been said. Requests 17, 19 and 22 concern the rights of the defendants while under arrest to remain silent and that such silence shall not be considered adversely by the jury.

The defendants after their apprehension did not remain completely silent. At the police station Martineau stated, among other things, that he had never heard of Nelson. Nelson told Attorney General Nugent of Rhode Island that he accompanied Almonte to Nashua in Tomasian's automobile, and when Nugent told him that was not Almonte's story, Nelson asked, "What did Almonte tell the police?" When told that Almonte had said that he came to Nashua alone in response to a telephone call from Nelson, Nelson made no reply. He later commented upon the fact that Almonte had inquired the way at the Bedford police station by saying, "I'm laughing and I ought to be jumping out that window."

"When a statement is made in the presence and hearing of an accused, which is incriminating in character, and such statement is not denied, contradicted, or objected to by him, the statement and the fact of his failure to deny are admissible on a criminal trial

as evidence of his acquiescence in or admission of its truth." 2 Wharton's, Criminal Evidence, s. 405. Whether silence is evidence of assent to statements made depends upon whether opportunity and motive to deny the truth of the accusation existed. *State* v. *Wargo*, 83 N. H. 532, 534. As Wigmore points out, in such cases the better rule is to allow some flexibility according to the circumstances. IV Wigmore, Evidence (3d *ed.*) *s.* 1072, *par.* 4. The evidence was properly received in the Court's discretion. The requests which the Court declined to grant contained the assumption that the accused remained silent and stood "clear of all responsibility in relation to whatever may be said." In the form in which requested, the instructions were properly denied. The weight of the evidence was for the jury to determine under the customary tests.

Requests Nos. 28 and 29 in substance requested the Court to submit the question of manslaughter to the jury.

The Court instructed the jury generally that if the evidence warranted, they could find the defendants guilty of murder in the first degree or in the second degree or they could find them not guilty.

To warrant a conviction of murder in the first degree, the State must prove beyond a reasonable doubt not only that the killing was done with malice but that it was deliberate and premeditated or done in perpetrating or attempting to perpetrate a collateral felony, in this case kidnaping. RSA 585:1.

Malice, like other facts, must be found by the jury and is not an inference of law. Malice in its legal sense is "a wrong motive of any kind" and " . . . signifies the wilful doing of an injurious act, without lawful excuse." *State* v. *Pike,* 49 N. H. 399, 404.

The distinguishing element between murder and manslaughter is the absence of malice. While manslaughter may be killing with a design to effect death, "the offense is reduced to manslaughter, by circumstances of great and sudden provocation . . . . " *State* v. *Greenleaf,* 71 N. H. 606, 612.

Applying these principles to the evidence, it was the duty of the Court to determine as a matter of law whether there was any evidence to warrant a finding of manslaughter. The defendants denied that they in any way participated in the crime. There was evidence that the victim was unconscious when shot. There was no evidence that he was killed in a sudden passion caused by adequate provocation. On the contrary, the evidence taken as a whole

admitted of only one offense — murder. *State* v. *Thorp*, 86 N. H. 501, 504, 505.

Defendants' exceptions to the failure of the Court to charge as requested are overruled.

Exception was taken to the argument of the Attorney General principally because in reviewing Nelson's testimony he argued to the jury " . . . and he lied repeatedly on the witness stand and demonstrably on the witness stand." While it is true that the jury are the final judges of the veracity of any witness, in view of the testimony of the defendants and their denial of all charges made by the State, we think their testimony was susceptible to such a characterization. The terms used by the Attorney General did not transgress the bounds of legitimate advocacy.

The final issues of error assigned by the defendants are whether the Court erred in denying defendant Nelson's motion to set aside the verdict on the ground that Nelson, having been found not guilty in Indictment 481 charging him as principal, precludes the jury from finding him guilty of aiding and abetting as charged in Indictment 480, and of kidnaping as charged in Indictment 728. The defendant-contends that the conviction of Nelson as a "principal in the second degree" in Indictment 480 is legally impossible in view of his acquittal as principal in Indictment 481.

The defendants concede that this contention "may seem like playing upon the niceties of legal distinction" but contend that since this state makes a distinction between accessories and principals, such a distinction exists. It is argued that *State* v. *Buzzell*, 58 N. H. 257, is decisive and that *Gaskins* v. *Commonwealth*, 97 Ky. 494 supports their argument.

The Attorney General, in his argument, requested the jury to convict the defendants under Indictments 480 and 728, and to acquit both defendants in Indictment 481. The verdict of the jury in 481 that Nelson was not guilty as a principal in the first degree is a finding by the jury that he did not physically pull the trigger that killed Gagnon, but it did not establish that he was not "present, aiding, abetting and assisting the said Fred J. Martineau the felony, crime and offense aforesaid to do and commit" as charged in Indictment 480.

The jury had a choice, based upon the evidence, to determine which of the two fired the fatal shot and which aided and abetted. The Court specifically charged the jury that they could not convict the defendants under both indictments although they could bring in

verdicts of not guilty on both. They were further instructed that if they found Martineau guilty of firing the fatal shot and that Nelson was present aiding and abetting, then it must follow that they be found not guilty as to Indictment 481 which charged Nelson with firing the shot, but if they found Nelson killed Gagnon, then they should find him guilty of murder in the first degree, and if they further found that Martineau was present aiding and abetting, then he must be found guilty in the same degree as Nelson.

The facts in *Buzzell* and *Gaskins, supra,* differ from those before us in that each defendant had been individually indicted, tried and acquitted upon a charge of murder and was later tried for other offenses growing out of the same case. The defense of former jeopardy was at issue in each case.

In the case before us, the defendants were tried on three indictments simultaneously. No defense of former jeopardy could be involved and the Court's instructions to the jury adequately protected their rights in the event of acquittal. It was necessary for the State to so proceed in order to permit full presentation of the evidence and to give effect to any findings which the jury might properly make upon the evidence. Were the law otherwise, it would provide a loophole for the guilty to escape the judgment of the jury on the basis of the evidence presented.

The fact that Nelson was acquitted as principal in Indictment 481 did not preclude the jury from finding him guilty as a principal in 728 wherein he was indicted jointly with Martineau in the kidnaping and killing of Gagnon. His acquittal as principal in 481, as has been noted, established only that he did not pull the trigger. It did not establish that he was not a participant in the kidnaping and murder of Gagnon, and equally guilty with Martineau of the offense charged in 728.

*Exceptions overruled.*

All concurred.