Rockingham
No. 80-248

THE STATE OF NEW HAMPSHIRE

v.

BRUCE DARCY

March 16, 1981

*Gregory H. Smith,* acting attorney general (*David L. Harrigan,* assistant attorney general, on the brief and *Peter W. Mosseau,* assistant attorney general, orally), for the State.

*Bernard J. Robertson,* of Exeter, by brief and orally, for the defendant.

PER CURIAM. The issues in this manslaughter case are whether RSA 630:2, I(a) (1974) (current version at Supp. 1979) is void for vagueness, whether the indictment was constitutionally sufficient, whether the evidence was sufficient to support a guilty verdict, and whether the sentence imposed by the court was excessive. We reject the defendant's arguments and affirm.

An indictment dated June 18, 1979, charged the defendant with violating RSA 630:2, I(a) and alleged in part that

> "Bruce Darcy did knowingly cause the death of Florence Nudd at her residence on Dogtown Rd., Exeter N.H. by shooting her once in the chest with a .32 calibre rifle, while he was under the influence of extreme mental or emotional disturbance caused by extreme provocation."

RSA 630:2, I(a) (1974) (current version at Supp. 1979) provides that:

"A person is guilty of . . . [manslaughter] when he causes the death of another

(a) Under the influence of extreme mental or emotional disturbance caused by extreme provocation but which would otherwise constitute murder. . . ."

At trial, the defendant moved to dismiss the indictment on the grounds that both the statute and the indictment were unconstitutionally vague. *Mullavey*, J., denied this motion. A jury found the defendant guilty, and the court sentenced him to imprisonment for four to ten years. The defendant appealed.

The defendant first argues that RSA 630:2, I(a) is vague because of the use of the phrase "but which would otherwise constitute murder." We reject this contention.

■■ The difference between murder and manslaughter is the presence or absence of malice aforethought. *See State v. Nelson*, 103 N.H. 478, 489, 175 A.2d 814, 822, *cert. denied*, 369 U.S. 879 (1961); *State v. Greenleaf*, 71 N.H. 606, 611, 54 A. 38, 41 (1902). Thus, a killing which would otherwise be murder is reduced to manslaughter if committed in the heat of passion caused by severe provocation because such circumstances negate the element of malice aforethought. 2 C. TORCIA, WHARTON'S CRIMINAL LAW § 153 (14th ed. 1979); *see State v. Nelson, supra* at 489, 175 A.2d at 822.

■ RSA 630:2, I(a) codifies this ancient concept by providing that an act of killing which would otherwise be murder is reduced to manslaughter if committed under "the influence of extreme mental or emotional disturbance caused by extreme provocation." One need only turn to the preceding sections of RSA ch. 630 to find the definitions of the various degrees of murder. RSA 630:1 (capital murder); RSA 630:1-a (first-degree murder); RSA 630:1-b (second-degree murder). We find no unconstitutional vagueness in the statute in question.

■ We are not convinced by the defendant's argument that RSA 630:2, I(a) eliminates the defense of self-defense because it uses the term "[u]nder the influence of extreme mental or emotional disturbance caused by extreme provocation." Self-defense may still be asserted as a defense and proved under the statute

when the facts support such a claim. The quoted language simply reduced to manslaughter what would otherwise be murder and in no way interferes with the defense of self-defense.

The defendant argues that the use of the term "knowingly" in the indictment renders the indictment unconstitutionally vague. We disagree.

 RSA 630:1-b, I(a) states that a person is guilty of second-degree murder if he "knowingly causes the death of another." The inclusion of the term "knowingly" in the indictment specifically informs the defendant of the precise definition of murder under which the State claims he would be guilty had the killing not been committed under the influence of extreme mental or emotional disturbance caused by extreme provocation. Rather than making the indictment vague, the use of the term knowingly helps the defendant to know exactly on which of the several definitions of murder found in the preceding sections of RSA ch. 630 the State relies. The indictment gave the defendant ample information to enable him to prepare for trial and is therefore constitutionally sufficient. *State v. Meloon*, 119 N.H. 76, 77, 397 A.2d 1041, 1042 (1979).

 The defendant's third argument is that the evidence was insufficient to support the guilty verdict. In ruling upon the sufficiency of the evidence, the question is whether, upon viewing all the evidence in the light most favorable to the prosecution, any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hardy*, 120 N.H. 552, 554, 419 A.2d 398, 399–400 (1980).

The evidence introduced at trial indicates that the defendant, age 68, had been friendly with the victim, Florence Nudd, for many years. He sometimes stayed at her home and assisted her in taking care of the place. Mrs. Nudd kept in her home several guns which belonged to her son. Mrs. Nudd's son also was friendly with the defendant, with whom he had hunted on numerous occasions. There was evidence that Mrs. Nudd did not use the guns but kept them at her house as a favor to her son, who wished to keep them away from his own son.

In March 1979, at the time of the incident in question, the defendant was staying with Mrs. Nudd. On March 21, at approximately 4:00 A.M., Mrs. Nudd went across the street to a Mr. Snyder's house to call the police. She told the police that the

defendant had slapped her, pushed her and torn the telephone from the wall, and she requested that the police come and remove him. There was evidence that she was very upset. She then left the Snyder house and returned to her own home to wait for the police. About five minutes later, Snyder heard two "thumps" five or ten seconds apart coming from the Nudd house. The police arrived about ten minutes after Mrs. Nudd had made the telephone call. There were no lights on in the house but, with the aid of their headlights, the police officers could see a person sitting in what they later learned was the living room. They knocked on the front door but there was no answer. The police officers then went to the rear of the house, where they found the defendant standing at the back door.

One of the officers testified that, when asked what had happened, the defendant replied: "She tried to shoot me and I pushed the bathroom door against the gun and she fell." The defendant had been wounded. The police officers found Mrs. Nudd's body lying on the kitchen floor in front of the door leading to the bedroom with a .32 calibre lever action rifle under her right arm. A bullet hole was found in the ceiling which, the parties stipulated, was caused by the shot that wounded the defendant. The shot had entered his left chest area at an upward angle. His shirt was in contact with the muzzle of the gun when it was fired. The bullet that killed Mrs. Nudd entered her right breast at a downward angle, exited about ten inches below on her left side, and then lodged in the bedroom door at a downward angle. An expert witness testfied that the muzzle of the gun was at least twelve inches from Mrs. Nudd when it was fired but could not say whether the muzzle had been any farther away. Mrs. Nudd was four feet, seven inches tall; the defendant was five feet, nine inches tall.

The police interviewed the defendant at a hospital about sixteen hours after the killing. At that time, he stated that he and Mrs. Nudd had argued about his use of the telephone for long distance calls, that she had hit him with the telephone, that she then had left the house and returned when he was in the bathroom, and that when he had emerged from the bathroom, she had come toward him, poked the rifle into his stomach and fired. He stated that, at the time Mrs. Nudd shot him, his back was to the doorway leading from the kitchen to the bathroom. He said that he fell down after being shot and became unconscious and that when he came to Mrs. Nudd was standing over him threatening to hit him with the butt of the rifle while cursing and kicking him. He maintained that he

had grabbed the rifle in order to take it away from her but that it discharged accidentally. The defendant's testimony at trial corresponded to this statement given at the hospital.

Given the evidence that the bullet that killed Mrs. Nudd entered at a downward angle, the jury was entitled to disbelieve the defendant's explanation. The fact that the muzzle was at least twelve inches from the entrance wound at the time the rifle was fired also casts doubt on any theory that the gun went off during a struggle. The jury could find that the defendant shot Mrs. Nudd when he was some distance from her and could even find that, because of the angle at which the bullet entered, she was not standing at the time. The jurors could also reject any suggestion of self-defense because the defendant, if in possession of the gun, could have retreated from the house. Additionally, the defendant's version of how he was injured is suspect in light of the fact that the bullet which wounded him went through the ceiling and out through the roof.

■ On the evidence before it, the jury was entitled to accept the State's theory that after the defendant had been shot, he had grabbed the gun, had ejected the shell by activating the lever action and had fired the shot that killed Mrs. Nudd. We therefore hold that the evidence was sufficient to uphold the verdict. *See State v. George*, 93 N.H. 408, 43 A.2d 256 (1945).

The defendant's final argument is that, in view of his age and health, the sentence of imprisonment for four to ten years is excessive and denies him a meaningful and rehabilitative sentence in violation of the Federal and State Constitutions. U.S. CONST. amend. VIII; N.H. CONST. pt. I, art. 18.

■■ In *State v. Wentworth*, 118 N.H. 832, 842, 395 A.2d 858, 865 (1978), we made it clear that rehabilitation, in the modern sense of the word, is not a constitutional right or requirement. "The real purpose of all sentencing is to reduce crime," and our Constitution recognizes deterrence as a legitimate purpose of sentencing. *Id.* at 842, 395 A.2d at 865. Although in this case imprisonment may not be required to deter this particular defendant from committing manslaughter, general deterrence is also an important consideration, *id.* at 842–43, 395 A.2d at 865, as is public confidence in the system of justice. Many persons who are incarcerated for having committed homicide are not dangerous. They committed their crimes, as did this defendant, under a set of

circumstances which are not likely to recur. It may be argued that a crime of this nature, committed in the heat of passion, is not likely to be deterred by imprisonment. Yet it is recognized that there are some crimes for which imprisonment may properly be thought to be the appropriate sentence even though it may not have a deterrent effect; otherwise, the seriousness of the crime would be unduly depreciated. ABA STANDARDS RELATING TO SENTENCING ALTERNATIVES AND PROCEDURES, Standard 2.5(c)(iii) (Approved Draft 1968); *see Gregg v. Georgia*, 428 U.S. 153, 184 n.30 (1976). This is not to say that imprisonment is always required in a case such as this but rather that it is a proper sentence which may be imposed in the discretion of the court.

██ The authorized sentence in this manslaughter case (RSA 630:2, I(a)) was seven and one-half to fifteen years. RSA 651:2, II. The minimum sentence imposed in this case was only slightly more than half of that which was authorized. Considering all the circumstances, we do not find that the sentence is excessive or in violation of any provision of the Federal or State Constitutions.

*Exceptions overruled; affirmed.*