**Victor Eugene BROMWELL, Defendant, Appellant,**

v.

**STATE of Delaware, Plaintiff, Appellee.**

Supreme Court of Delaware.

Submitted Nov. 12, 1980.

Decided March 23, 1981.

Karl Haller and William B. Wilgus, Asst. Public Defenders, Georgetown, for defendant, appellant.

John M. Sandy and Merritt S. Burke, Deputy Attys. Gen., Gorgetown, for plaintiff, appellee.

Before McNEILLY, QUILLEN and HORSEY, JJ.

HORSEY, Justice:

Defendant, Eugene Bromwell, was convicted in a jury trial in Superior Court of Robbery II, 11 *Del.C.* § 831, and was sentenced to ten years in prison. Defendant's appeal raises two issues: (1) whether the exclusionary rule required suppression of evidence obtained in a warrantless police search of a box in Bromwell's possession made while Bromwell was under detention but not arrest; and (2) whether reversible error was committed by the State's questioning of Bromwell as to any prior criminal record.

I

About 3:30 in the morning on the day of defendant's detention and arrest, an armed robbery had occurred at a motel on Route 13 near Greenwood, Sussex County, Delaware. The robbery was reported to the nearby Bridgeville State Police Troop as having been committed by two black males, one of whom was described as masked but wearing blue jeans and tennis shoes and about 6 feet tall. Between $550 and $600 in cash was said to have been stolen. Both men were said to be armed and at large. Sometime later that day, State Police Officer James Mollohan of the Bridgeville Troop went on highway patrol duty. He had been given a description of the men wanted in connection with the robbery.

About 2:30 in the afternoon on the same day Officer Mollohan was directed to investigate a suspicious individual (Bromwell) on County Route 32, a few miles west of Greenwood. A resident of the area, a rural farming community within five miles of the scene of the robbery, had called the police to come and investigate a stranger in the neighborhood.[1]

Arriving at the scene, Officer Mollohan found defendant seated on a cardboard box by the side of the road. The officer asked defendant for some identification, what he was doing there and where he was headed.[2] Defendant could produce no identification.

---

1. The resident, leaving his home on Route 32 by car, had seen defendant approaching on foot and picked him up mistakenly thinking that defendant was a neighbor looking for a ride. After traveling a short distance and finding that defendant was headed in the wrong direction for his intended destination, the resident let defendant out of his car with instructions as to what direction and route to take. The resident became suspicious when he saw that defendant had disregarded his instructions and instead had headed back toward the resident's home and sat down in a field off the road. The resident abandoned his trip, returned to his home, telephoned the police and requested them to find out what the stranger was doing in the neighborhood.

2. 11 *Del.C.* § 1902(a) authorizes a peace officer to "stop any person abroad, or in a public place, who he has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and where he is going."

When defendant said he was headed for Salisbury, Maryland, the officer told him he was on the wrong road. When defendant was asked where he was from, defendant gave the officer first one address and then another. The officer noted that defendant matched the description of one of the motel robbers. He was black, was wearing blue jeans and tennis shoes and was about six feet tall. His pants were wet and he appeared to be tired. His face was scratched and stuck with pieces of briars as though he had been running through woods. Officer Mollohan radioed his troop to run an "NICI" check on defendant's name to see if he was "wanted"; and Mollohan apparently also sought assistance, for another highway trooper arrived shortly. The officer was suspicious of defendant.

Officer Mollohan's suspicions as to defendant's involvement in the motel robbery were increased after defendant gave the second trooper a third purported place of residence and withdrew $120 from his pocket after being asked if he had any funds for public transportation. Officer Mollohan also noted that defendant appeared to be guarding the cardboard box by keeping it between his legs. The officer noted that the carton was partially open and he could see within it assorted items: a nylon stocking tied to a picture frame; a can; and what appeared to be a pillowcase stuffed in the can. Within the case could be seen something that the officer could not identify. Officer Mollohan then made a pat-down search of defendant's clothing for weapons; and when none were found, the officer extended his search to the cardboard box at defendant's feet. Officer Mollohan stated that he searched the box out of concern for his safety and to be certain that there was no weapon in the box.

A scuffle occurred; but whether it preceded or followed the search is disputed. Defendant's version is that while one officer (Mollohan) engaged him in conversation, the other officer surprised him from behind

and pulled him away from the carton, whereupon the carton was searched. Officer Mollohan's version was that the scuffle occurred after his search of the carton revealed no weapons but a substantial amount of cash within the pillowcase, later determined to amount to $505.40. The sum consisted of loose coins and bills of small denominations, along with discarded paper coin wrappers. Defendant's arrest immediately followed.

## II

In a pretrial motion, defendant informed the Court that he would "explain the circumstances under which the alleged stolen goods came into his possession."[3] And in his opening statement, defense counsel stated that defendant "will explain to you where [the money] came from." However, at trial, defendant moved to suppress the trooper's testimony as to the contents of the box, that is, the money that was found within the pillowcase, as being the product of an unreasonable search and seizure. The State resisted the motion contending that extending the weapons search to the open box was permissible as a protective measure for the officers' safety while defendant was under detention. The Court denied defendant's motion to suppress as well as a later motion for judgment of acquittal. Thereafter, defendant took the witness stand. He testified that while hitchhiking in search of work he found the box with the money in it by the side of the road; and that he had intended to turn it over to the police when he was detained. As stated, defendant was found guilty of Robbery II.

## III

■ Defendant's objection on appeal goes neither to his detention nor to the "frisk." He impliedly concedes both acts of the officer to have been lawful. Defendant's contention is that his Fourth Amend-

---

**3.** Defendant's stated reason was to rebut the statutory presumption under 11 *Del.C.* § 306(c)(2) that one possessing "goods ac-

quired as a result of the commission of a recent crime is presumed to have committed the crime."

ment rights[4] were violated by the officer's extension of his search for weapons to the content of the cardboard box beside defendant. In effect, defendant argues that Officer Mollohan's justification for searching the box was insufficient as a matter of law;[5] that any search beyond a weapons frisk was made without reasonable cause and was an unnecessary and unreasonable invasion of defendant's privacy.

## IV

The question presented relates to the permissible scope of a police officer's warrantless search, not incident to an arrest,[6] of a suspect properly stopped on the highway and then detained for further questioning on suspicion of having recently committed an armed robbery. More specifically, did the operative facts justify Officer Mollohan's extension of his detention search for weapons beyond a "frisk" of Bromwell to the open box at his feet?

4. The Fourth Amendment provides in part, "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . and no warrants shall issue, but upon probable cause. . . ." The Fourth Amendment is applicable to the State through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

5. Officer Mollohan testified that before searching the box he had decided to take Bromwell to his police car for further questioning; and that he searched the box to be certain there were no weapons in it.

6. Had the search of the box been incident to an arrest for probable cause, there would be no question but that the search was lawful. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Applying *Chimel*, this Court in *State v. Culver*, Del.Supr., 288 A.2d 279 (1972) upheld an officer's "automatic" weapons search of luggage within the immediate control of an arrestee, though charged with a minor offense—hitchhiking. In *Culver*, the officer admittedly had no reason to suspect that the arrestee was armed or to fear for his safety. However, this Court held that the *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) standards for determining reasonableness of a search prior to an arrest were inapplicable to a search incident to an arrest. We stated that the propriety of extending a "frisk" search incident to an arrest to objects within the immediate control of an arrestee

Under the facts of this case we hold that the Trial Court properly denied defendant's motion to suppress. This holding is based on our conclusion that the officer's extension of a "frisk" search for weapons to the open carton at defendant's feet was justified and reasonable under the circumstances and not an invasion of defendant's Fourth Amendment privacy rights.

## A.

Officer Mollohan's roadside stop, detention and "frisk" of defendant was clearly proper under *Terry v. State of Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and defendant does not contend otherwise.[7] However, defendant claims that the extension of the pat-down search of his clothing to the box at his feet was an impermissible extension of *Terry* and amounted to nothing more than a fishing expedition for evidence of possible criminal activity. Brom-

was not to be resolved by applying the subjective test adopted in *Terry* for determining the reasonableness of an officer's concern for his security when weighed against a suspect's right of privacy.

7. In *Culver*, we stated as to *Terry*, "There, the issue was the right of an officer to 'stop and frisk', for a dangerous weapon prior to an arrest. [And in a footnote, we added:] In concluding its [the Supreme Court's] evaluation of the balance to be struck between the right of the police officer to protect himself and the citizen's constitutional right to be free from intrusion and unreasonable search, the Court stated that the proper balance prior to an arrest, in the *Terry* 'stop and frisk' situation, must be

' * * * a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual * * *; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. * * * And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion of 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. * * *.' 88 S.Ct. at 1883." 288 A.2d at 282.

well argues that because the NICI record check had cleared him, Mollohan had no reason to believe that Bromwell was armed and dangerous.[8] Bromwell relies heavily upon the fact that since he had made no attempt to reach into the box, it was unreasonable for Mollohan to search the box. *Cf. Nash v. State,* Del.Supr., 295 A.2d 715 (1972) and *State v. Wausnock,* Del.Supr., 303 A.2d 636 (1973). Thus, the parties clash over the reasonableness of the extension of the weapons search to the box.

However, a threshold question exists as to the proper test to determine the lawfulness of this pre-arrest search—the subjective reasonableness-balancing test prescribed in *Terry* or the more traditional test of "probable cause." As stated above, *Terry* was noteworthy for substituting for the traditional test of probable cause for any "arrest," a subjective rule based on a balancing test of safety or security of the officer as opposed to the privacy of the individual being intruded upon.

In *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Supreme Court refused to apply the *Terry* balancing test to determine the reasonableness of a custodial interrogation in a police station. Justice Brennan, speaking for a majority of the Court, commented on *Terry* as follows:

> Before *Terry v. Ohio,* 392 U.S. 1, [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), the Fourth Amendment's guarantee against unreasonable seizures of persons was analyzed in terms of arrest, probable cause for arrest, and warrants based on such probable cause. The basic principles were relatively simple and straightforward: The term "arrest" was synonymous with those seizures governed by the Fourth Amendment. While warrants were not required in all circumstances, the requirement of probable cause, as elaborated in numerous precedents, was treated as absolute.
>
> \*     \*     \*     \*     \*     \*
>
> The standard of probable cause thus represented the accumulated wisdom of

precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest "reasonable" under the Fourth Amendment. The standard applied to all arrests, without the need to "balance" the interests and circumstances involved in particular situations. *Cf. Camara v. Municipal Court,* 387 U.S. 523 [87 S.Ct. 1727, 18 L.Ed.2d 930] (1967).

> *Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause. That case involved a brief, on-the-spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an "arrest."
>
> \*   ˑ   \*     \*     \*     \*     \*
>
> And to determine the justification necessary to make this specially limited intrusion "reasonable" under the Fourth Amendment, the Court balanced the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety. *Id.,* [392 U.S.] at 22–27, [88 S.Ct. at 1880–1883]. As a consequence, the Court established "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.,* at 27, [88 S.Ct. at 1883]. Thus, *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intru-

---

8.  Yet Bromwell overlooks the fact that Mollohan's weapons frisk [which is conceded to have

been proper] also followed his NICI "clearance."

sive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons.

442 U.S. 207–210, 99 S.Ct. 2253–2255.

However, in a concurring opinion in *Dunaway*, Justice White apparently had misgivings about the implications of Justice Brennan's construction of *Terry*; for Justice White stated:

> The opinion of the Court might be read to indicate that *Terry v. Ohio*, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), is an almost unique exception to a hard-and-fast standard of probable cause. As our prior cases hold, however, the key principle of the Fourth Amendment is reasonableness—the balancing of competing interests. *E. g., Delaware v. Prouse*, 440 U.S. 648, 653–654 [99 S.Ct. 1391, 1395–1396, 59 L.Ed.2d 660] (1979); *Michigan v. Tyler*, 436 U.S. 499, 506 [98 S.Ct. 1942, 1948, 56 L.Ed.2d 486] (1978); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 321–322, [98 S.Ct. 1816, 1824–1825, 56 L.Ed.2d 305] (1978); *United States v. Martinez-Fuerte*, 428 U.S. 543, 555 [96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116] (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, [95 S.Ct. 2574, 2578, 45 L.Ed.2d 607] (1975); *Terry v. Ohio, supra*, [392 U.S.] at 20–21 [88 S.Ct. at 1879–1880]; *Camara v. Municipal Court*, 387 U.S. 523, 536–537, [87 S.Ct. 1734–1735, 18 L.Ed.2d 930] (1967). But if courts and law enforcement officials are to have workable rules, see *Rakas v. Illinois*, 439 U.S. 128, 168 [99 S.Ct. 421, 443, 58 L.Ed.2d 387] (1978) (dissenting opinion), this balancing must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers. *Cf. Mincey v. Arizona*, 437 U.S. 385, 394–395 [98 S.Ct. 2408, 2414–2415, 57 L.Ed.2d 290] (1978). On the other hand, the need for rules of general applicability precludes neither the recognition in particular cases of extraordinary private or public interests, *cf. Zurcher v. Stanford Daily*, 436 U.S. 547,

564–565, [98 S.Ct. 1970, 1980–1981, 56 L.Ed.2d 525] (1978), nor the generic recognition of certain exceptions to the normal rule of probable cause where more flexibility is essential. *Cf., e. g., Terry v. Ohio, supra.* It is enough, for me, that the police conduct here is similar enough to an arrest that the normal level of probable cause is necessary before the interests of privacy and personal security must give way.

442 U.S. at 219–220, 99 S.Ct. at 2260.

In the same vein, Justice White, speaking for the Court in *State v. Prouse*, Del.Supr., 382 A.2d 1359 (1978), aff'd, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), stated:

> The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law-enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions...." '

440 U.S. at 653–654, 99 S.Ct. at 1395–1396.

In *Stewart v. State*, Del.Supr., 409 A.2d 1052 (1979), the reasonableness of a police officer's "seizure" (detention and weapons frisk) of defendant, a pedestrian stopped and detained on a city street, was at issue. We ruled that the *Terry* competing interest balancing test standard, as interpreted in *Dunaway*, was to be applied rather than the traditional test of probable cause.[9]

*Terry, Prouse, Dunaway,* and *Stewart* all concern the lawfulness of a warrantless stop and detention amounting to a seizure of the person. Here we are concerned with the scope of a warrantless search incident to a concededly lawful seizure—of one suspected of a recent armed robbery. The question is whether the *Terry* test of balancing competing interests or the traditional probable cause test should control.

Where the search of a suspect properly detained is established to have

---

9. Finding Stewart's seizure to have been based on objective facts reasonably leading the officer to believe that Stewart matched the description of a man wanted for an armed felony committed 10 days earlier, we held Stewart's detention and "limited frisk" to be reasonable and hence lawful under *Terry*.

been made for reasons of safety, we think that the permissible scope of a "safety search" should be determined by balancing the competing interests of the officer's security and the suspect's privacy rights. As Justice White stated in *Dunaway*, the "key principle of the Fourth Amendment is reasonableness—the balancing of competing interests"; and where flexibility is essential, the "hard and fast standard of probable cause" should give way. 442 U.S. at 219, 99 S.Ct. at 2260. And as Justice Harlan stated in *Terry*, "Once that forced encounter was justified ... the officer's right to take suitable measures for his own safety followed automatically." 392 U.S. at 34, 88 S.Ct. at 1886.

In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court applied the *Terry* test to determine the lawfulness of an officer's reaching through the window of a car to remove a handgun from the occupant's waistband. Finding the officer to have reasonable cause to believe that the occupant was armed and dangerous, the Court ruled the officer's action to have been "reasonable" since undertaken for his safety.

■ Here, too, we think the lawfulness of Officer Mollohan's search of the box should be determined by a balancing of the competing interests—the officer's safety and the degree of intrusion upon defendant's privacy rights. To impose an inflexible limit upon a weapons search of a suspect lawfully detained under suspicion of armed felony to a clothing frisk, regardless of the attendant circumstances would, we think, be unrealistic and unreasonable.

■ Applying the balancing of competing interests test to the facts of this case, we conclude that it was reasonable for Officer Mollohan to extend his "safety search"[10] of defendant for weapons to the box in defendant's possession. And conversely, defendant's expectation of privacy as to the box's contents was nominal, at best. Indeed, defendant's standing even to challenge the search is dubious. *Cf. Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ The cardboard box was, as defendant concedes, clearly labeled "Delaware State College"; and the box's visible contents were plainly not the usual personal effects. Further, defendant does not strenuously argue that search of the box was an invasion of his privacy rights. To do so would be inconsistent with (1) defendant's pretrial motion; (2) defendant's opening statement that he would "explain the circumstances under which the alleged stolen goods came into his possession"; and (3) defendant's testimony that he told the officers he had just found the money. Had there been no reason to connect defendant with the armed robbery and had his container been a closed suitcase or secured luggage presumptively containing personal effects, as to which there would be an expectation of privacy, defendant's position would find support. *Cf. United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).[11]

10. Defendant argues that the search of the box was a search for evidence, not weapons, and that the open carton posed no threat to Officer Mollohan. However, the fact remains that Officer Mollohan testified that he extended his frisk search for weapons to the box out of concern for his safety. The Officer testified, on cross-examination:

Q. My question is: Before you got to searching the box, which you were doing for your own safety; is that correct?
A. Yes.
Q. Before you started going into the box, what were you going to do with him? Were

you going to take him to the Troop or let him stay there on the road?
A. I was going to take him in the police car.
Q. Did you know what you were going to do?
A. First I had to search the box and his person to make sure there was no weapons in there.

11. In *Sanders*, the Court discussed privacy expectations and Fourth Amendment rights as to containers and packages as opposed to suitcases or personal luggage.

Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth

▊ Given the attendant circumstances of a forced encounter with a suspected robber guardedly protecting an open carton, we think defendant's privacy rights, if any, to its remaining contents were clearly outweighed by the officer's reasonable concern for his safety. And having seized the open box out of concern that a weapon might be within, the officer, we think, took "the only reasonable course" in immediately searching it for any hidden weapon. *Cf. Nash v. State, supra,* 295 A.2d at 717.

## V

Finally, defendant argues that he was deprived of a fair trial, *first*, by the Trial Court's failure to take curative action with respect to a statement by defendant on direct examination that he was on parole; and *second*, by the prosecutor's follow-up question to defendant as to the crime that was the basis for his parole. We find no merit to the contention.

Taking the stand in his own defense, defendant, when asked on direct examination what he, a Maryland resident, was doing in Sussex County, Delaware on the day of his arrest, stated:

> I came over here for a job employment and had my parole transferred over here. I was hitchhiking my way over here and I was asking directions on the way. I was informed by a friend that I could get a job. . . .

Defense counsel did not interrupt defendant's testimony to make any request of the Court as to defendant's mention of "parole." On cross-examination of defendant, the following colloquy occurred:

> Q. Mr. Bromwell, you noted on direct examination that you wanted to get your parole transferred to the State

of Delaware. If you had been paroled, have you ever been convicted of a crime?

> Mr. Haller: I object to that.

> The Court: Sustained.

No further reference was apparently made to defendant's statement of being on parole; and the case went to the jury without any request by counsel for any instruction on the subject.

Defendant now contends that it was "plain error" for the Trial Judge not to have *sua sponte* stricken from the record defendant's reference to being on parole and not to have cautioned the jury to disregard defendant's remark in considering his innocence or guilt. As to the State's follow-up question on cross-examination, defendant argues that even though the Court sustained his objection to the question, the very question was sufficient to taint the verdict by re-introducing to the jury the matter of defendant's prior criminal misconduct.

▊ We do not find any error, much less plain error, in the Court's handling of defendant's testimony. Defendant, of course, was solely responsible for injecting into his testimony his status as a parolee, implying a prior criminal record; and having volunteered the information, the question of a curative statement became a judgmental matter for defense counsel, in the first instance, and otherwise the Court. From the silence in the record, it is reasonable to assume that counsel was of the view that the less said, the better. For the Court to let the remark pass without interrupting defendant's testimony was, we think, a discretionary matter; and we find no abuse of discretion. Whether defendant's parole

Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. See *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (*per curiam*). There will be difficul-

ties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile. 99 S.Ct. 2593, 2594, n. 13.

was for a misdemeanor or a felony required determining; and we think the Court properly left that subject to counsel. Clearly there was no plain error.[12]

▆▆▆▆ Equally clearly the State was entitled to cross-examine defendant as to his prior criminal conduct which was the basis for his parole admission. *See Britt v. State,* Del.Supr., 402 A.2d 808 (1979). If defendant's record included a prior felony, the question would have been proper, if properly framed. *See Waller v. State,* Del. Supr., 395 A.2d 365 (1978). Since the form of the question was improper, the Court properly sustained defendant's objection; and no error occurred.

Affirmed.

12. The doctrine of "plain error" is but an exception to the general rule that an appellate court will not consider a question not fairly presented below. Superior Court Criminal Rule 52(b); *Ward v. State,* Del.Supr., 366 A.2d 1194 (1976). The doctrine of plain error is limited to "material defects which are apparent on the face of the record and . . . basic, serious, and fundamental in their character, and which clearly deprive [an] accused of a substantial right, or which clearly shows manifest injustice . . . ." *Ward v. State, supra* at 1197.