**David RUSH, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.
Submitted: July 2, 1984.
Decided: March 18, 1985.

James R. Lally (argued), Nancy Jane Mullen (argued), Patricia C. Hannigan (argued), Asst. Public Defenders, Richard E. Fairbanks (argued), former Asst. Public Defender, Wilmington, for appellant.

Eugene M. Hall (argued), State Prosecutor, John A. Parkins (argued), Richard J. McMahon (argued), former Deputy Attys. Gen., Kevin A. O'Brien, Deborah A. Blom, Deputy Attys. Gen., Wilmington, for appellee.

Before HERRMANN, C.J., McNEILLY, HORSEY, CHRISTIE, JJ., and STIFTEL, President Judge, constituting the Court en Banc.

HERRMANN, Chief Justice, and CHRISTIE, Justice.

## AS TO THE GUILT PHASE

CHRISTIE, Justice.

This is an appeal by defendant, David R. Rush, from the convictions of two counts of first degree murder (involving a single victim), two counts of attempted first degree murder, and one count each of first degree robbery, first degree kidnapping, and possession of a deadly weapon during the commission of a felony. These charges emanated from an incident which occurred on October 2, 1980 at the Wall To Wall Sound Store located at 4012 Concord Pike in Wilmington. The evidence indicates that on the day in question the defendant appeared to be nearing the completion of a lengthy purchase transaction when he calmly produced a handgun and shot the manager of the store, Vinson M. Sowards, and a salesperson, Robinni C. Gorneau. Mr. Sowards subsequently died as a result of the shooting. When a second salesperson, Anthony Viviani, was unable to open the cash register at the defendant's demand, he too was shot.

A customer in the store, Alan S. Friedland, was then directed, at gunpoint, to help the defendant remove stereo equipment from the store and place it in the defendant's van which was parked outside. As soon as defendant and Friedland had left the store, Mr. Viviani, although wounded, managed to lock the door behind them and call the police. When defendant heard the door close behind him, he started to return to the store, and Mr. Friedland seized this opportunity to flee to a gas station across the street. At this point, defendant drove the van to his sister's home in New Castle County, where he had been staying, and, from there, he drove to his girl friend's residence at a college in West Virginia. Ms. Gorneau was taken to the hospital, where she gave the defendant's name to the police. (Defendant previously had shown her his business card.) Ms. Gorneau subsequently identified defendant at trial.

As a result of Ms. Gorneau's identification and information given to the police by the defendant's sister, the defendant was arrested the next day in West Virginia.

At trial the defendant raised the affirmative defense of "not guilty by reason of insanity" pursuant to 11 *Del.C.* § 401.[1] In support of this theory the defense presented several witnesses who testified that the defendant was working long hours and felt pressured in his employment situation. His domestic relationships with his sister, brother-in-law, and roommate were deteriorating. His girl friend had recently departed to attend college in West Virginia. Testimony revealed defendant's abuse of Valium, in an apparent attempt to cope with his problems.

Several mental health experts testified as to defendant's mental capacity. The defense presented two psychologists and a psychiatrist who testified as to defendant's inability to control his impulses under pressure situations. One of these experts, Dr. Milkie, had previously examined and treated defendant for three months in early 1977, while the others saw defendant for the first time in April of 1981. These doctors attributed defendant's lack of self-control to a condition known as antisocial personality disorder. They described this condition as a form of mental illness which could have developed from a failure to treat a childhood malady or defect known as minimal brain dysfunction. It was the opinion of these experts that the conditions previously alluded to inhibited defendant's ability to control himself under stressful circumstances. Defendant's experts were not permitted to testify as to treatment which they would then have proposed for defendant's "mental illness".

The two doctors who testified for the State were of the opinion that defendant was competent to stand trial. They agreed that defendant had impulsive tendencies. However, the State's experts concluded that Mr. Rush did appreciate the difference between right and wrong when he entered the Wall To Wall Sound on October 2, 1980, and that he was capable of restraining his impulses. The jury found the defendant guilty of all charges on April 27, 1981.

I

■ Defendant contends that the trial court erred when it denied defendant's request for a special jury pursuant to the provisions of 10 *Del.C.* § 4541.[2] We find

---

1. The General Assembly has amended 11 *Del.C.* § 401 effective July 2, 1982. However, at the time this case was tried 11 *Del.C.* § 401 stated in pertinent part:

(a) In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or mental defect, the accused lacked substantial capacity to appreciate the wrongfulness of his conduct or lacked sufficient willpower to choose whether he would do the act or refrain from doing it.

(b) If the defendant prevails ... the trier of facts shall return a verdict of "not guilty by reason of insanity".

2. 10 *Del.C.* § 4541. *Procedure for obtaining, striking and summoning special jury.*

(a) A special jury for the trial of a cause, shall be ordered by the Court upon the application of either party.

that the special jury statute applied to civil cases only, and that there is no provision in Delaware for special juries in criminal cases.

The legislative history of the Delaware special jury statute, from its inception in 1810, indicates that special juries were to be confined to courts of civil jurisdiction.[3] 4 Del.Laws, ch. 601, p. 322. It is only in the codification of these legislative enactments that the special jury statute has been so placed as to obscure its limited application. The court rule governing the use of special juries applies only to civil cases (*see* Superior Court Civil Rule 40), and there is no record of the use of a special jury for a criminal case in Delaware.

## II

Defendant contends that the trial court abused its discretion when it failed to require the State to elect between a charge of first degree murder involving an intentional killing[4] and first degree murder which prescribes a reckless killing committed during the course of a felony.[5] Although defendant admits that it is permissible for the State to charge contradictory theories as to how a single offense was committed, he asserts that the charges are, in fact, inconsistent, and, therefore only one of the two contradictory charges may ultimately be proved.

Despite the fact that Mr. Sowards was the sole victim of defendant's killing, defendant was convicted of murder in the first degree under each of these two different subsections of 11 *Del.C.* § 636. Subsection (a)(1) requires the State to prove the defendant "intentionally" caused the death of another person. The Delaware Code defines "Intentionally" in pertinent part as follows:

(a) INTENTIONALLY—A person acts intentionally with respect to an element of an offense when:

---

(b) The party applying for the special jury under this section shall give due notice to the opposite party, and to the Prothonotary, of the time and place of striking such jury. At such time and place the Prothonotary, or his deputy, or if the Prothonotary is not indifferent between the parties, then 2 proper persons indifferent between the parties, appointed by the Superior Court, shall attend with a list of 48 indifferent and judicious citizens of the county, qualified to serve as jurors, showing their names and places of abode.

(c) The party applying for the special jury under this section, his agent or attorney, shall first strike out one of the names, and then the opposite party, his agent or attorney, shall strike out another; and so on, until each shall have struck out 12. If the opposite party, or any person on his behalf, shall not attend, or shall refuse to strike, the Prothonotary or his deputy, or the persons appointed to strike the jury, as the case may be, shall strike for the party not attending, or refusing to strike.

(d) After each party shall have struck 12 names under this section, the remaining 24 persons on the list shall be the jury to be returned for the cause. The Prothonotary, or his deputy, or the persons appointed to strike the jury, as the case may be, shall thereupon deliver to the sheriff a certified list of the names of such persons, with their places of abode, as the jurors to be summoned for the cause, annexed to a venire facias commanding him to summon them. The sheriff shall, thereupon, summon the persons named, according to the command of the writ, and shall return the list with the venire.

3. As the trial court noted in its letter opinion of March 20, 1981:

It thus appears that special juries were used only in the Supreme Court and the Court of Common Pleas, which had civil jurisdiction, but not in the Court of Oyer and Terminer and General Gaol Delivery or the Court of General Quarter Sessions of the Peace and Gaol Delivery, whose jurisdiction was exclusively criminal. 1 Woolley on Delaware Practice § 6. This indicates that special juries were used in civil, but not in criminal, cases.

4. Count I alleges that the defendant violated 11 *Del.C.* § 636(a)(1), which provides that:

(a) A person is guilty of murder in the first degree when:
(1) He *intentionally* causes the death of another person. (Emphasis added.)

5. Count II alleges that defendant violated 11 *Del.C.* § 636(a)(2), which provides that:

(a) A person is guilty of murder in the first degree when:
\* \* \* \* \* \*
(2) In the course of and in the furtherance of the commission ... of a felony or immediate flight therefrom, he *recklessly* causes the death of another person. (Emphasis added.)

(1) If the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause that result. 11 *Del.C.* § 231(a).

Subsection (a)(2) requires the State to prove the defendant "recklessly" caused the death of another person, while committing or in the furtherance of, in the instant case, a robbery. "Recklessly" is defined in pertinent part as follows:

(c) RECKLESSLY—A person acts recklessly with respect to an element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from his conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. 11 *Del.C.* § 231(c).

Defendant argues that he cannot be convicted on one charge of "intentionally" killing and on a second charge of "recklessly" killing the same person. He bases his argument on 11 *Del.C.* § 206(a)(3) which provides:

(a) When the same conduct of a defendant may establish the commission of more than 1 offense, the defendant may be prosecuted for each offense. The defendant's liability for more than 1 offense may be considered by the jury whenever the State's case against him for each offense is established in accordance with § 301[6] of this title. He may not, however, be convicted of more than 1 offense, if:

\* \* \* \* \* \*

(3) Inconsistent findings of fact are required to establish the commission of the offenses.

Defendant contends that inconsistent factual findings are inherent when there is one

killing and differing mental elements (intentional versus reckless) are charged.

■■■ We find that the trial judge did not err or abuse his discretion when he decided not to require the State to elect between the two charges of murder in the first degree. There is no inconsistency in charging the defendant under both theories of first degree murder or in the jury's verdicts. The evidence presented supported both murder theories. A factual finding that a defendant acted intentionally may also include a finding of recklessness under 11 *Del.C.* § 253, which states in pertinent part:

When a statute provides that criminal negligence suffices to establish an element of an offense, the element also is established if a person acts intentionally, knowingly or recklessly. When recklessness suffices to establish an element of an offense, *the element also is established if a person acts intentionally or knowingly.* When acting knowingly suffices to establish an element of an offense, the element also is established if a person acts intentionally. (Emphasis added.)

Furthermore, this Court has previously addressed this issue in *Conlow v. State*, Del.Supr., 441 A.2d 638 (1982). In that case we held that it was neither error nor abuse of discretion for the trial judge to fail to require the State to elect, before trial, whether it would prosecute the defendant for the intentional killing or felony murder (reckless killing) of the same victim during the commission of a robbery. Defendant in *Conlow* also argued that the inconsistent nature of such charges mandated an election by the State. However, such a position is contrary to the criminal rule pertaining to joinder of offenses, which states that "[t]he same offense may be charged by several counts, as having

---

**6.** 11 *Del.C.* § 301 states:

(a) In any prosecution for an offense, a prima facie case for the State consists of some credible evidence tending to prove the existence of each element of the offense.

(b) No person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.

been committed in different ways or by different methods, in order to anticipate and accommodate every possible contingency in the evidence." 2 Wharton's Criminal Procedure § 296, at 140 (12th ed. 1975); *State v. Nelson*, 103 N.H. 478, 175 A.2d 814 (1961).

■ In the case at bar, defendant has cited no authority which would indicate that this Court should reverse its decision in the *Conlow* case. The determination as to whether or not the State should be required to elect between counts which are charged and then presented to the jury is a matter left to the discretion of the trial judge, and that decision will not be overturned on appeal unless there is a showing of abuse of discretion. *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894). The Superior Court judge did not abuse his discretion in the present case.

### III

Another argument set forth by defendant is that the trial court abused its discretion by permitting the State to introduce evidence which the defense labels irrelevant and cumulative. In particular, defendant points to the medical examiner's testimony as to the cause of death and Mrs. Sowards' testimony identifying her husband as the victim of defendant's killing. The defense attorneys assert that these facts were not in dispute, and they insist that the cumulative nature of such testimony, even if relevant, unfairly prejudiced defendant.

Rule 401 of the Delaware Uniform Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

■ There is no doubt that the medical examiner's testimony concerning the cause of death and Mrs. Soward's identification of her husband as the victim constitute relevant evidence. The mere fact that such

evidence may or may not have been in dispute is not determinative of this issue. The advisory committee notes of Fed.R. Evid. 401 (which is paralleled by D.R.E. 401) clearly state:

> The fact to which the evidence is directed need not be in dispute. While situations will arise which call for the exclusion of evidence offered to prove a point conceded by the opponent, the ruling should be made on the basis of such considerations as waste of time and undue prejudice (see Rule 403), rather than under any general requirement that evidence is admissible only if directed to matters in dispute. Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding. Charts, photographs, views of real estate, murder weapons, and many other items of evidence fall in this category. A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this helpful evidence, or at least the raising of endless questions over its admission.

Fed.R.Evid. 401 advisory committee note.

Our next inquiry must be directed toward a consideration of D.R.E. 403. This rule states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

■ The limited testimony proffered by the medical examiner and Mrs. Sowards did not involve undue delay or confusion of issues. The proper and fair limitation on cumulative and/or prejudicial evidence is best evaluated by the trial court, which has a first-hand opportunity to consider these matters. *See State v. Boyd*, Del.Super., 91 A.2d 471, 472 (1952). Authorities have recognized that "[t]his balancing of intangibles—probative values against probative

dangers—is so much a matter where wise judges in particular situations may differ that a leeway of discretion is generally recognized." McCormick, McCormick on Evidence, § 185, at 440 (2d ed. 1972). Furthermore, it must be noted that the State has the burden of proof and must be afforded considerable latitude in the introduction of evidence. Under the circumstances here present, we conclude that the trial judge did not abuse his discretion by admitting the testimony as to which the objections were raised.

## IV

■ We find that it was not error for the trial court to refuse to charge the jury as to the consequences of a verdict of not guilty by reason of insanity. This Court has consistently held that information as to what is likely to be the post-trial disposition of the defendant's case, as a result of various possible verdicts by the jury, is not a proper consideration for the jury. The applicable reasoning is that the jury's decision should be limited to a determination of defendant's guilt or innocence. Furthermore, the difficulty of describing with any degree of certainty, the consequences of a verdict of not guilty by reason of insanity militated against giving such an instruction.[7] *Garret v. State*, Del.Supr., 320 A.2d 745 (1974); *Hand v. State*, Del.Supr., 354 A.2d 140 (1976); *McCarthy v. State*, Del. Supr., 372 A.2d 180 (1977); *see also* 11 *A.L.R.3d* 737 (1967).

## V

Defendant next contends that the trial court erred in refusing to allow a psychia-

trist and a psychologist who had examined defendant to testify regarding the kind of treatment they would have proposed for defendant. They assert that this error was further exacerbated by the State's summation, which referred to the failure of one doctor to have defendant committed in 1977.

■ At trial, Rush presented several mental health experts. Two of these experts, Dr. Weintraub and Dr. Milkie, explained the nature of their diagnoses and were prepared to state the treatment they would have proposed for Rush. The State objected on the ground that such testimony would, in effect, deal with the question of the consequences of a finding of not guilty by reason of insanity. The trial judge, in ruling that the proposed testimony was irrelevant, relied on the ruling in *Hand v. State, supra.* We agree that the reasoning applied by this Court in *Hand* is also dispositive of the issue of the type of treatment which those doctors would have proposed prior to trial. Jurors could not be expected to consider such testimony without speculating on whether such treatment would be appropriate if defendant was found not guilty by reason of insanity. This evidentiary ruling made by the trial judge was discretionary and will not be reversed unless it is shown to be arbitrary and capricious. *United States v. Long*, 574 F.2d 761 (3d Cir.1978); *United States v. Robinson*, 560 F.2d 507 (2d Cir.1977) (en Banc).

The defense wanted to question Dr. Milkie as to his recommendations for the treatment of defendant in 1977. In reading

---

**7.** At the time of conviction, 11 *Del.C.* § 403 provided: (a) Upon the rendition of a verdict of "not guilty by reason of insanity," the court shall, upon motion of the Attorney General, order that the person so acquitted shall forthwith be committed to the Delaware State Hospital. (b) A person committed to the Delaware State Hospital in accordance with subsection (a) of this section shall be kept there until the *Superior Court* of the county wherein the case was tried is satisfied that the public safety will not be endangered by his release. The Superior

Court shall without special motion reconsider the necessity of continued detention of a person thus committed after he has been detained for 1 year. It shall thereafter reconsider his detention upon motion on his behalf or whenever advised by the State Hospital that the public safety will not be endangered by his release.

A new version of 11 *Del.C.* § 403, effective July 21, 1982, has eliminated the discretion previously vested in the Superior Court with respect to post-trial commitments for mental disease.

from a report which he had made in 1977, the doctor was permitted to present some testimony as to the treatment he had suggested. But he was precluded from testifying as to the possible institutionalization of defendant if the other methods of treatment proved unsuccessful. The court, again referring to *Hand*, concluded that such testimony was irrelevant and could unnecessarily confuse the jurors. It then appears that the State took inappropriate advantage of this ruling when, in closing summation, counsel asked the jury the following rhetorical question:

> If David Rush was such a walking time bomb—and those are Mr. Schnee's words—no witness has ever testified that he was a walking time bomb—if he was, why didn't Dr. Milkie commit him or attempt to have him committed?

■■■ Defendant challenges these comments for the first time on appeal, and, therefore, the issue is not properly before this Court unless it is determined that plain error was committed. To satisfy this standard the error complained of must be so clearly prejudicial that the very fairness and integrity of the trial was jeopardized. *Bromwell v. State*, Del.Supr., 427 A.2d 884, 893 n. 12 (1981); *Dutton v. State*, Del.Supr., 452 A.2d 127, 146 (1982). While the State's closing comments constituted error we do not think that the State's effort to minimize the nature of defendant's mental condition, as of 1977, prevented a fair evaluation of his condition as of October 2, 1980. We find no reversible error in the State's actions.

## VI

The defense took the position that, if its contention that defendant was not guilty by reason of mental illness failed, then the jury should consider whether defendant acted under extreme emotional distress. Under the provisions of 11 *Del.C.* § 641, a finding of extreme emotional distress would reduce murder in the first degree to manslaughter.[8]

The trial judge informed the attorneys before their closing arguments that he would give a charge on extreme emotional distress in accordance with 11 *Del.C.* § 641 as to both murder counts, but the judge went on to state that he would not attempt to define extreme emotional distress because that term is not defined by statute, and it is difficult to define.[9] The defense contends that the court's statements precluded either party from defining the term.

The defense attorney, in closing, referred to the significance which the law attaches to a finding that defendant was acting under extreme emotional distress at the time of the alleged crimes, but he avoided defining the term. The State, in rebuttal, criticized the defense attorney for not defining the term and went on to offer a definition of the term, knowing that the defense

---

**8.** 11 *Del.C.* § 641. *Extreme emotional distress.*

The fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing the crime of murder in the first degree as defined by § 636 of this title to the crime of manslaughter as defined by § 632 of this title. The fact that the accused acted under the influence of extreme emotional distress must be proved by him by a preponderance of the evidence. The accused must further prove by a preponderance of the evidence that there is a reasonable explanation or excuse for the existence of the extreme emotional distress. The reasonableness of the explanation or excuse shall be determined from the viewpoint of a reasonable person in the accused's situation under the circumstances as he believed them to be.

**9.** I have decided that a definition of extreme emotional distress should not be included for a couple of reasons. One is that the Commentary specifically says that such a definition was not included, and elsewhere in the Code as well as in the Commentary, it says that where terms are not defined, they should be given their commonly-accepted meaning.

Second, I think it's very hard to define the term. Although a definition was given in the *Boyd* case, and the Supreme Court did not state that no definition should be given, they did find that the choice of words was not fully acceptable. My own view is that it's inherently difficult to define the term in a helpful way, and, therefore, we should follow the express mandate of the Commentary and Code of not attempting to define it.

would not have the opportunity to offer a different definition.

The defense says that this amounted to unfair prosecution tactics similar to those which led to the reversal of the conviction in *Bailey v. State*, Del.Supr., 440 A.2d 997 (1982).

■ After examining the context in which the trial judge's ruling on the definition of extreme emotional distress was rendered, we are of the opinion that the court merely intended to state that he would not define the term in his charge to the jury. He did not intend to prohibit either the State or defense counsel from discussing a definition of the term in their arguments to the jury. Under the circumstances, the State's definition was not improper. On the other hand, the prosecutor's subsequent criticism of the defense's failure to define the term was inappropriate. This does not amount to reversible error.

## VII

The court instructed the jury that a person is presumed to intend the natural and probable consequences of his intentional act and then went on to explain the presumption as a permissible inference. Defendant concedes that such an instruction was proper but objects to an illustration which the trial judge used to explain the permissive inference. The illustration was as follows:

> Thus, in this case, if you find that the defendant intentionally shot Vinson M. Sowards, Robin C. Gorneau, and Anthony Viviani with a gun, you are permitted to find that he intended to cause their death.

■ It is contended that this illustration suggests that defendant must be guilty of murder whereas another "natural and probable consequence" of the intentional shootings could have been to merely incapacitate the victims in order to facilitate the robbery. Defendant's argument is *without merit*. The court's single illustra-

tion of a permissible inference, which was especially pertinent to this case, was not an abuse of discretion.

## VIII

The final contention (pertaining to the guilt phase of defendant's trial) raised by defendant is that the jury's verdict of guilty, which rejected the insanity defense, was not supported by the evidence.

■ The standard applicable to our determination is whether, after viewing the evidence in the light most favorable to the State, any reasonable juror could have found sufficient evidence to support a verdict of guilty. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We find that sufficient facts and expert testimony were presented to justify the jury's finding that defendant was sane and, therefore, guilty beyond a reasonable doubt.

\* \* \* \* \*

## AS TO THE PENALTY PHASE

HERRMANN, Chief Justice.

■ The determinative issue as to the penalty phase of the case is whether the Trial Judge committed reversible error in giving an *"Allen*-type" charge [10] to the jury after it announced that it was deadlocked regarding a recommendation of the death sentence.

We hold that the Trial Court did so err and, accordingly, the death sentence must be vacated.

## I.

After the jury found the defendant guilty of first-degree murder, the Trial Court proceeded to conduct the separate penalty proceeding prescribed by 11 *Del.C.* § 4209(b).

Following the arguments of counsel, the Trial Judge delivered written instructions to the jurors and charged them as follows:

---

10. *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

Ladies and gentlemen, the written instructions have now been circulated and I will, therefore, read them at this time. The Criminal Code [11] says as follows:

Any person who is convicted of first-degree murder shall be punished by death or by imprisonment for the remainder of his or her natural life without benefit of probation or parole or any other reduction, said penalty to be determined in accordance with this section.

Upon a conviction of guilt of a defendant of first-degree murder, the Superior Court shall conduct a separate hearing to determine whether the defendant should be sentenced to death or to life imprisonment without benefit of probation or parole....

A sentence of death shall not be imposed unless the jury finds:

1. Beyond a reasonable doubt at least one statutory aggravating circumstance; and

2. Unanimously recommend, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury submits such a finding and recommendation, the Court shall sentence the defendant to death. A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court. The Trial Judge completed his instruction as follows:

In order for a sentence of death to be imposed, the jury must find that the evidence establishes beyond a reasonable doubt the existence of the following statutory aggravating circumstance: the murder was committed while the defendant was engaged in the commission of robbery.

You will be given a written interrogatory [12] on which to indicate your finding.

If you do not unanimously find beyond a reasonable doubt the existence of this aggravating circumstance, you should mark this on the written interrogatory, and notify the bailiff that you are ready to return to the courtroom.

If you do unanimously find beyond a reasonable doubt that this statutory aggravating circumstance exists, you must then weigh and consider any mitigating circumstances or aggravating circumstances, including, but not limited to, the statutory aggravating circumstance that you have already found to exist. After weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, weighing any mitigating factors against the aggravating factors, you should indicate on the written interrogatory whether the jury unanimously rec-

---

11. *See* 11 *Del.C.* § 4209(a), (b), (c), and (d).

12. The interrogatories delivered to the jury were as follows:

### INTERROGATORIES TO JURY

1. Does the jury unanimously find that the following statutory aggravating circumstance exists: the murder was committed while the defendant was engaged in the commission of robbery?

Yes_____No_____

If the answer to question 1 is Yes, answer question 2. If it is No, notify the bailiff that you are ready to return to the courtroom.

2. Does the jury unanimously recommend that a sentence of death be imposed?

Yes_____No_____

| | |
|---|---|
| Foreman | Juror No. 7 |
| Juror No. 2 | Juror No. 8 |
| Juror No. 3 | Juror No. 9 |
| Juror No. 4 | Juror No. 10 |
| Juror No. 5 | Juror No. 11 |
| Juror No. 6 | Juror No. 12 |

ommends that a sentence of death be imposed.

The foregoing constituted the entire charge which the jury received before retiring to deliberate upon the sentence it should recommend.

Approximately two hours later, the bailiff delivered to the Trial Judge the following verbal message from the jury: "The foreman advised me that they cannot reach a unanimous decision and that those who are strongly opposed feel they cannot reach an agreement."

The Court informed counsel of its intentions:

> Now, what I propose to do is to bring the jury back into the courtroom and ask the foreman to hand the interrogatories to the Clerk and then the—and then look at it, and if it's filled in, I propose to ask the Clerk to take the verdict. If it's not filled in, I propose to address the foreman to see whether there is any question or problem that the jury has on which it might need further instruction.

Defense counsel objected, stating:

> As I commented in chambers, although I recognize that the time is just about two hours and fifteen minutes or so now, maybe a bit less, when [the bailiff] got the word from the foreman, that any kind of an instruction by the Court to further deliberate or attempt to reach a unanimous verdict would be inappropriate under Section 4209, which is dissimilar to the typical case. Obviously, the consequences are severe, and so the defense feels very strongly about that.

In a colloquy with counsel at this stage, the Court discussed the unique nature of a § 4209 recommendation as to penalty; i.e., any lack of unanimity in recommending the death sentence results, automatically by operation of law, in a sentence of life imprisonment without possibility of probation or parole. The Court stated to counsel:

> THE COURT: This verdict, it seems to me, differs somewhat from your standard verdict in which the verdict of the jury must be unanimously one way or the other. Here the jury must do two things before the death penalty may be imposed: One is they must unanimously find beyond a reasonable doubt that at least one statutory aggravating circumstance exists; and, two, they must unanimously recommend death.
>
> The statute expressly provides for the possibility of the jury not being able to come to a unanimous agreement as to one or both points and states that if the jury cannot unanimously find that at least one statutory aggravating circumstance exists and cannot unanimously recommend death, the Court shall sentence the defendant to life imprisonment.
>
> It seems to me that there are two concerns here. One is that I need to be sure that the jury understands what it is expected to do, and I'm referring in particular to the difference between points 1 and 2, because in this particular case the only possible answer to question 1 is "yes," because by their verdict they found that an aggravating circumstance exists, and I want to make sure that there is no misunderstanding on that point, because I didn't specifically instruct the jury on that point in accordance with the statute.
>
> *The second possible concern is somewhat more difficult, and that is whether the jury should be asked to deliberate further in an effort to reach unanimity, which I understand to be the request of the State, and I do not think that the Court should attempt to bring about unanimity where the statute itself provides for the result where there is no unanimity. I think that the most the Court could do is to make sure that the jury is not laboring under any misunderstanding and has had a full opportunity to deliberate upon the matter. Anything that goes beyond that that would verge on coercion of the jury, no matter how slight, I think must be avoided at this point.*
>
> Now, how I'll go about doing it will depend on what the jury has to say.

Bring the jury in.
(Emphasis supplied)

When the jury returned to the courtroom, the Court instructed the foreman to hand up the interrogatories. At this point the Interrogatory form had been signed by all 12 jurors. Interrogatory No. 1 (Does the jury unanimously find the existence of a statutory aggravating circumstance?) was answered in the affirmative. The answer to Interrogatory No. 2 (Does the jury unanimously recommend that a sentence of death be imposed?) was left blank. The foreman then asked, *"Are you aware that we asked for instructions, sir?"* The Trial Judge replied, *"Well, we weren't sure. Would you tell us exactly what your request is?"*

THE FOREMAN: *Yes sir. There are—most of the jurors have an open mind, can be convinced one way or the other; there are at least jurors of opposing viewpoints that say they cannot have their viewpoint changed under any circumstances. Therefore, we wish you to instruct us what we should do about the form.*

*It's signed, with the exception of "yes" or "no" awaiting your instruction.*

\* \* \*

THE FOREMAN: *Do you care to know what question, sir? There are two questions on the sheet.*

THE COURT: *Yes.*

THE FOREMAN: *And it only involves one question.*

THE COURT: *Yes. Which question?*

THE FOREMAN: *This is question 2, sir.*

THE COURT: *All right. So, the jury has reached unanimous agreement as to question 1?*

THE FOREMAN: *Yes, sir.*

THE COURT: *All right. And the difficulty that you're conveying to us is with question 2. Thank you. We understand.*

(Emphasis supplied)

Following a short recess, the Trial Judge stated his proposed instructions to counsel. Defense counsel objected, on the grounds that the jury had already announced a result by stating its failure to reach unanimity on Question 2; and that a "super charge" was inappropriate in a § 4209 penalty proceeding.

The Trial Judge noted the objection. However, he indicated that he was concerned about the fact that some jurors had "closed minds" and wanted to ensure that the jury had "a full and fair opportunity to deliberate." He stated: "I intend to tell them as soon as they feel further deliberations would be pointless, they should answer the question 'no' if they haven't reached unanimity, because here it's not required."

As the jury re-entered the courtroom, the Court granted a sidebar conference during which defense counsel requested that the Court first ask the jury whether further deliberations would be helpful. The Court declined to do so and proceeded to give the following supplemental instructions to the jury:

Ladies and gentlemen, your question raises two concerns: One is whether the nature of the second question on your interrogatory sheet is fully understood; and, secondly, whether you feel further deliberations would be desirable.

Unlike an ordinary verdict where there must be unanimous agreement by all twelve jurors one way or the other, that is, guilty or not guilty, question 2 simply asks, "Does the jury unanimously recommend that a sentence of death be imposed?" If there is not unanimous agreement to recommend a sentence of death, the answer to that question must be "no."

However, we do want to make sure that you have had, in your own view, a full opportunity to deliberate on the matter with complete understanding. In other words, there was a reference to certain jurors not having an open mind on the subject, and I would instruct you, follow-

ing up on that point, that jurors do have a duty to consult with one another, although each juror must finally decide the issue for himself or herself, but only after an impartial consideration of the evidence with your fellow jurors.

In the course of deliberations, a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it's erroneous. However, no juror should surrender an honest conviction solely because of the opinion of your fellow jurors.

So, in a nutshell, we urge you all to deliberate with an open mind, and beyond that point we would simply ask you, yourselves, as a group, to determine whether further deliberations are appropriate, and if so, to conduct them.

On the other hand, if you are satisfied that further deliberations would not be productive, and you have not reached unanimity as to question 2, then the answer to that question should be "no" and we would simply receive it as your answer.

So, with those further instructions we'll ask you to return to the jury room. Whether you, in view of your previous deliberations, decide to complete the interrogatory and terminate further deliberations, or whether you deliberate further is entirely up to you.

The jury retired, returning approximately 45 minutes later. The foreman then delivered the completed interrogatory form to the Court with Question 2 marked in the affirmative. Thereafter, the jury was polled and each answered affirmatively to the Clerk's question: "Is that your verdict?"

## II.

We are of the opinion that the supplemental instructions which the Trial Judge gave to the jury in the instant case constituted, in effect, an *Allen*-type charge which had no proper place in this § 4209 penalty phase proceeding.

The typical *Allen*-type charge is a supplemental instruction given by the trial judge to a deadlocked jury in a case where the law requires a unanimous verdict. Generally, the *Allen*-type charge arises during the guilt phase of a trial. It is designed to prevent a hung jury by urging deadlocked jurors to deliberate further with the hope that ultimately they will return a unanimous verdict of guilt or innocence. *See Adkins v. State*, Del.Supr., 454 A.2d 732 (1982); *Jenkins v. State*, Del. Supr., 401 A.2d 83 (1979). By suggesting further deliberations, a court attempts to prevent unnecessary retrials with the resultant additional expenditures of time and expense by all concerned.

This Court addressed the general nature and purpose of the *Allen*-type charge in *Brown v. State*, Del.Supr., 369 A.2d 682 (1976). There, we recognized that a supplementary instruction, referred to as an *"Allen* charge" or a "dynamite charge," is generally proper in order to encourage the jury to reach a verdict where unanimity is required; but we there cautioned:

> However, a trial judge may not coerce the jury into reaching a verdict and, for that reason, any such charge must be carefully examined to determine its total effect on the jury in reaching a verdict.
> * * *
> It is basic to our criminal law that a jury verdict must be unanimous and freely given and that, in order to convict, each individual juror must be convinced of the defendant's guilt beyond a reasonable doubt; it is likewise basic that there is no absolute necessity that the jury reach a verdict. The danger of a "dynamite charge" is that it may suggest to the jurors that these fundamental standards might be compromised in order that a verdict be reached. * * *
> Nevertheless, we believe that this danger can be eliminated by having the charge include an admonition that each individual juror not surrender his or her honest convictions and not to return any verdict contrary to the dictates of person-

al conscience. * * * Without such an admonition, any supplementary charge may be, for that reason alone, overly coercive.

369 A.2d at 684. *See also Streitfeld v. State*, Del.Supr., 369 A.2d 674, 677 (1977).

■ It thus appears that, even in an ordinary jury case where unanimity is essential to the result, it is a delicate matter for the court to instruct a deadlocked jury to deliberate further. In a § 4209 death penalty hearing, in which lack of unanimity *per se* results in a sentence of life imprisonment, such instruction is fatal as being overly coercive.

The reason is manifest on the face of the Statute: By § 4209(d)(1), it is provided that a death sentence shall not be imposed unless the jury unanimously finds one statutory aggravating circumstance and unanimously recommends that a sentence of death be imposed. And by § 4209(d)(3), it is provided that if the jury "cannot unanimously recommend death, the Court shall sentence the defendant to life imprisonment without benefit of probation or parole." Thus, in the instant case, the jury reached and announced an ultimate decision in the penalty phase of the case when the foreman reported to the Court:

> * * * most of the jurors have an open mind, can be convinced one way or the other; there are at least jurors of opposing viewpoints that say they cannot have their viewpoint changed under any circumstances. Therefore, we wish you to instruct us what we should do about the form.

It is quite clear that the jurors were requesting instructions as to one problem and one problem only: how to answer Interrogatory No. 2 in view of their failure to agree upon the death penalty. It is clear,

too, that the Trial Judge's duty at that point was to instruct the jury to check the "No" box under Interrogatory No. 2; and he would have completely performed that duty if he had confirmed the accuracy of the foreman's statement by appropriate inquiry to the jury and had limited himself to the second paragraph of his supplemental instructions:

> Unlike an ordinary verdict where there must be unanimous agreement by all twelve jurors one way or the other, that is, guilty or not guilty, question 2 simply asks, "Does the jury unanimously recommend that a sentence of death be imposed?" If there is not unanimous agreement to recommend a sentence of death, the answer to that question must be "no."

It was error for the Court to engage in an effort to ensure that the jury had a "full and fair opportunity to deliberate"; and to instruct the jurors, under the circumstances then existent in this case, that "[I]n the course of deliberations, a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it's erroneous." Under the circumstances then existent in this case, no juror voting against the death penalty was obliged under the law to "think it over."

We may not overlook the reasonable probability of an unduly persuasive effect, intended or not, of the Trial Court's instructions upon the jurors. We must assume that some jurors in this case, according due regard and respect to the Trial Judge's views expressed or implied, received a message from the Bench that they should return to their deliberations and strive further toward that unanimity which, considering the limitations of Interrogatory 2,[13] could result only in a recom-

13. It is noted that in other Delaware Superior Court first degree murder cases, interrogatories to the jury have included the following:

(3.) DOES THE JURY UNANIMOUSLY RECOMMEND THAT A SENTENCE OF DEATH BE IMPOSED?
YES _____ NO _____

IF THE ANSWER TO QUESTION 3 IS "NO" ANSWER QUESTION 4.
(4.) DOES THE JURY UNANIMOUSLY RECOMMEND THAT A SENTENCE OF LIFE IMPRISONMENT BE IMPOSED?
YES_____NO_____
IF THE ANSWER TO QUESTION 4 IS "NO" ANSWER QUESTION 5.

mendation of the death sentence. The mere possibility of such a message is impermissible. *Compare Rose v. State,* Fla. Supr., 425 So.2d 521, *cert. denied,* 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983).[14]

■ In view of the unequivocal announcement that the jury was unable to reach unanimous agreement as to the death sentence, we hold that, under all of the circumstances, such announcement constituted, by necessary implication, a verdict having the same force and effect as a written "No" answer to Interrogatory No. 2.

\*    \*    \*    \*

(5.) IS THE JURY UNABLE TO REACH A UNANIMOUS VERDICT?
YES_____NO_____

**14.** The record indicates that the charge was given after the jury advised the court by a note which read, "We are tied six to six, and no one will change their mind at the moment. Please instruct us." At that point, the trial judge should have advised the jury that it was not necessary to have a majority reach a sen-

Accordingly, we conclude that the several convictions of the defendant stand affirmed. The death sentence, however, must be vacated and a life sentence be imposed upon the defendant as provided by the Statute. The case is remanded for further proceedings consistent herewith.

tencing recommendation because, if seven jurors do not vote to recommend death, then the recommendation is life imprisonment. There was no reason to give the *"Allen* charge" during the penalty phase of the trial. We therefore vacate the death sentence and hold that defendant is entitled to a new sentencing proceeding before a jury. \* \* \*
*Rose v. State,* 425 So.2d at 525.